**Juan E. ORTIZ, by and through his next friend, Ramon L. ORTIZ, Ramon L. Ortiz, and Alma I. Perez, Plaintiffs–Appellees,**

v.

**Brian KAZIMER and Dan F. Crisan, in both their official and personal capacities, Cleveland Department of Public Safety, Defendants–Appellants.**

No. 15–3453.

United States Court of Appeals, Sixth Circuit.

Argued: Jan. 27, 2016.

Decided and Filed: Feb. 4, 2016.

**ARGUED:** John Paul Bacevice, Jr., City of Cleveland, Cleveland, Ohio, for Appellants. Donald Screen, The Chandra Law Firm, LLC, Cleveland, Ohio, for Appellees. **ON BRIEF:** John Paul Bacevice, Jr., City of Cleveland, Cleveland, Ohio, for Appellants. Donald Screen, Subodh Chandra, Ashlie Case Sletvold, The Chandra Law Firm, LLC, Cleveland, Ohio, for Appellees.

Before: GUY, SUTTON, and McKEAGUE, Circuit Judges.

## OPINION

SUTTON, Circuit Judge.

Eyewitnesses saw a police officer chase down a sixteen-year-old boy with Down syndrome, take him from his mother's arms, slam him against an SUV, then pin his face against the car, all while ignoring pleas from standers-by that he was a harmless teenager. The officer admits that he saw (and felt) the boy surrender and heard him cry out in pain. Yet the officer, eyewitnesses say, kept him pinned down for fifteen minutes while another officer stood by. The boy and his family sued both officers, and both sought quali- fied immunity from the lawsuit through a motion for summary judgment. The district court rejected the motion. And so do we. At this stage of the case, when we must accept the truth of these eyewitness accounts as opposed to the officers' contrary testimony, the officers' qualified immunity defense must go to a jury. We affirm.

On a summer day in 2010, two armed-robbery suspects were on the loose in Cleveland, Ohio. Officers Brian Kazimer and Dan Crisan were on the case. The officers learned from the dispatcher that the suspects had stolen a wallet at gunpoint and had run toward a nearby apartment complex—the same complex, the dispatcher said, where two men had just given a nearly empty wallet to the apartment's manager. Coincidence? The officers thought not. After hearing that one of these men was wearing a red shirt and jeans, the officers drove to the apartments to investigate. As they pulled up, they saw someone who matched that description take off running. That gave them reasonable suspicion to detain the fleeing person, the district court held, *Ortiz v. Kazimer*, No. 1:11 CV 01521, 2015 WL 1400539, at *4–5 (N.D.Ohio Mar. 26, 2015), a finding the plaintiffs do not appeal. Officer Kazimer jumped out of the car and chased after the suspect.

As the plaintiffs and their eyewitnesses explain the chase, a resident of one of the apartments stepped in front of Kazimer, causing him to slow down. The resident knew whom the officer was chasing—Juan Ortiz, a sixteen-year-old boy. The officer must be mistaken in chasing him, thought the resident, because "why [would] a police officer [ ] be chasing a little boy with Down syndrome"? R. 27–2 at 1. The resident repeatedly told Kazimer about Juan's disability. "Shut up, get out of my way," the

officer responded. *Id.* The chase continued.

Juan stopped running when he made it to the apartment building's parking lot, where his family was waiting. He hugged his mother, who held onto him. Officer Kazimer, who caught up to him seconds later, admits that he saw Juan "surrendering." R. 25–2 at 33. According to eyewitnesses, Kazimer nevertheless "grabbed Juan from behind, forcefully pulled him from his mother's arms, and slammed him very hard into [a] vehicle like a football player making a tackle." R. 27–2 at 2. He then handcuffed Juan and "used his body weight"—205 pounds and twice Juan's weight—"to pin Juan against the hot vehicle." *Id.* Even though "Juan was not making any effort to resist" and was "crying out in pain," *id.,* and even after Kazimer gave an "ALL OK" signal to the dispatcher, R. 25–1 at 3, Kazimer reportedly kept Juan pinned for around fifteen minutes. Many residents yelled at Kazimer that Juan had done nothing wrong. But Kazimer responded: "I don't care," R. 27–3 at 1, pushed the residents away, and cursed at them. He told Juan's parents that they were "lucky he didn't shoot [Juan]." R. 25–4 at 50. That may be right.

At some point after Kazimer had pinned Juan against the SUV, Officer Crisan arrived on the scene. Even after learning of Juan's disability, seeing that Juan had long since surrendered, and hearing Juan's cries of pain, Crisan did nothing—except, according to several witnesses, hurl racial slurs at the onlookers. The ordeal ended only when the police dispatcher radioed the officers that the true robbers had been apprehended nearby. The officers let Juan go free.

Juan did not let the officers go free. He and his parents sued them, alleging that they violated Juan's Fourth (and Fourteenth) Amendment rights as well as several state laws. As a result of the confrontation, Juan alleged, he suffered chest pains, abrasions, posttraumatic stress, and other medical complications. The officers moved for summary judgment, claiming qualified immunity from the lawsuit. The district court denied the motion with respect to Juan's excessive-force claims and some of his state-law claims.

On appeal, the officers concede (quite refreshingly) the relevant facts for immunity and summary-judgment purposes: that Kazimer "slammed" or "tackled" a "surrendered" suspect, then "pinned" him down while Crisan watched nearby. Appellants' Br. 10, 18. We consider each claim against each officer in turn.

■ *Excessive force.* Police officers violate the Constitution when they use "unreasonable" or "excessive" force in seizing a person. *Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Officers lose their qualified immunity and can be held personally liable for using such force when "existing caselaw ... clearly and specifically hold[s] that what the officer[s] did—under the circumstances the officer[s] did it—violate[s] the Constitution." *Rudlaff v. Gillispie,* 791 F.3d 638, 641 (6th Cir.2015). At the same time, the doctrine insulates officers from liability for mere negligence; the law does not lightly subject officers to liability after the fact for doing a dangerous job that often requires split-second judgments in complicated, quickly evolving criminal investigations. Only the "plainly incompetent or those who knowingly violate the law" thus can be held liable. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

1. Kazimer. Under the plaintiffs' record-supported version of the facts, a jury could conclude that Kazimer used excessive force in seizing Juan. We have held,

not surprisingly, that when an officer slams a non-violent and capitulating suspect against a vehicle, that crosses the line between reasonable and excessive force. *Miller v. Sanilac County,* 606 F.3d 240, 252–54 (6th Cir.2010); *see also, e.g., Phelps v. Coy,* 286 F.3d 295, 298, 301–02 (6th Cir.2002). And we have held that an officer uses excessive force when he presses face-down a non-resisting and surrendered suspect longer than needed. *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 903 (6th Cir.2004); *see Martin v. City of Broadview Heights,* 712 F.3d 951, 961–62 (6th Cir.2013). We could cite many other cases along the same lines, *Lyons v. City of Xenia,* 417 F.3d 565, 578 (6th Cir.2005) (opinion of Sutton, J.) (doing so), but we need not prolong the point. Kazimer as it happens cites no caselaw to the contrary. If what the eyewitnesses say is true, he used excessive force.

 This use of force was clearly established as excessive before 2010. The just-cited cases support the point, as do many others saying that the gratuitous use of force against a suspect who has "surrendered" is "excessive as a matter of law." *E.g., Baker v. City of Hamilton,* 471 F.3d 601, 607 (6th Cir.2006); *see Hagans v. Franklin Cty. Sheriff's Office,* 695 F.3d 505, 509 (6th Cir.2012) (collecting cases). And that's the case even when the suspect had originally resisted arrest (say by running from the police, as here). *Baker,* 471 F.3d at 603, 608. According to the plaintiffs, Kazimer used extreme force against someone who, by the officer's own admission, looked like he "was surrendering" and who, by other eyewitness accounts, "was not making any effort to resist" and was "crying out in pain." R. 25–2 at 33; R. 27–2 at 2. A reasonable officer would have known better.

Kazimer tries to counter this conclusion in several ways, each unconvincing. He first calls our attention to the reality that some suspects fake their surrenders, only to try to escape anew or to assault the officer after the officer relaxes his hold on the suspect. But Kazimer fails to identify any feature of Juan's surrender that would give a reasonable officer pause that Juan was fabricating his submission to the officer's authority. Many features of the surrender as the plaintiffs explain it, moreover, confirm that it was not a ruse: Juan had stopped moving, was hugging his mother, and remained limp after being shoved against the car. Did the possibility of a fake surrender, moreover, really require the officer to pin this compliant suspect against a car for fifteen minutes? This was not the behavior of a recalcitrant criminal. Kazimer's "generalized speculation about the force required in other situations" (say, where a suspect is actually faking) "is immaterial to this case"—where eyewitnesses say Juan gave no signs of faking. *Malory v. Whiting,* 489 Fed.Appx. 78, 84 (6th Cir.2012).

The officer next submits that the chaotic nature of the scene made his use of force reasonable. The record, it is true, shows that ten or so people surrounded Kazimer, with many of them yelling at him and one or two reaching toward Juan. These facts may have justified the use of *some* force against Juan. But they do not justify the *amount* of force allegedly used here. Kazimer's purported level of force—slamming Juan (rather than, say, grabbing him) and pressing Juan against the hot car for fifteen minutes (rather than, say, removing him from the scene)—rises to the level of clearly excessive for summary-judgment purposes.

Other facts support this conclusion. The record shows that Kazimer gave an "ALL OK, CALMING DOWN" signal to the police dispatcher yet some say he continued to press Juan against the SUV for

about fifteen more minutes. R. 25–1 at 3. And it indicates that, at least on the plaintiffs' version of the events, no one posed a threat to Kazimer or touched him or Juan. The bystanders instead merely pleaded with Kazimer to stop hurting Juan and tried to alleviate Juan's obvious pain. Kazimer responded, say the eyewitnesses, not by reducing his level of force and not by removing Juan from the area but with shoves and curses. This evidence suffices to make the excessive-force question one for the fact-finding expertise of a jury, not one for the law-finding expertise of judges.

■ Kazimer adds that much of what the eyewitnesses purported to see is unlikely. Could Kazimer *actually* have slammed a disabled boy half his size against an SUV? Could he *actually* have pressed him against the hot car for fifteen minutes, even after giving the "ALL OK" signal to the police dispatcher? We have wondered the same thing. But the eyewitness accounts aren't "blatantly contradicted by the record," and that means we cannot disregard them on summary judgment. *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). We thus follow the time-tested Civil Rule 56 standard, accept the eyewitness accounts, and affirm the denial of Kazimer's qualified immunity defense.

■ 2. Crisan. The same conclusion follows for Officer Crisan. He may be held liable for Kazimer's excessive force on a failure-to-intervene theory. Our caselaw clearly establishes that police officers are liable for failing to stop ongoing excessive force when they observe it and can reasonably prevent it. *Turner v. Scott,* 119 F.3d 425, 429 (6th Cir.1997); *cf. Gazette v. City of Pontiac,* 41 F.3d 1061, 1065 (6th Cir. 1994). On the plaintiffs' facts, Crisan directly observed at least some of the excessive force and had the ability and opportunity to stop it. He entered the scene at some point after Kazimer had slammed Juan against the SUV. He saw a boy in handcuffs, pinned against the car, not posing a threat to anyone. He observed that the boy was not moving or resisting in any way. And he heard the boy's cries of pain. He even heard the apartment manager, the woman who had seen the actual suspect, tell him that the officers had the wrong person. Yet Crisan did not "attempt[ ] to prevent" the force and, worse, added ethnic slurs to the mix. *See Goodwin v. City of Painesville,* 781 F.3d 314, 329 (6th Cir.2015). His lack of action on this record establishes a cognizable claim that he violated Juan's clearly established constitutional rights.

■ *State-law claims.* That leaves Juan's battery, negligence, and negligent-infliction-of-emotional-distress claims against Kazimer. These too survive summary judgment. The record contains sufficient proof to satisfy the elements of these torts, and Kazimer doesn't argue otherwise on appeal. He instead contends that he deserves state-law immunity from the lawsuit, which he receives unless (as relevant here) his "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b).

This state-law immunity defense is not available to Kazimer on summary judgment. On this record taken in the plaintiffs' favor, his conduct was at least reckless—*i.e.,* he "perverse[ly] disregard[ed]" a "known risk" to Juan. *See O'Toole v. Denihan,* 118 Ohio St.3d 374, 889 N.E.2d 505, 517 (2008). He ignored the obvious chance that his actions were unjustifiably causing the boy serious harm, *see id.;* he could see that Juan had surrendered and could hear his cries of pain yet continued to use force. His alleged curses and comments, such as "[you're] lucky [I] didn't shoot him," may even go beyond recklessness to *malicious-*

*ness.* R. 25–4 at 50; *see, e.g., Piro v. Franklin Township,* 102 Ohio App.3d 130, 656 N.E.2d 1035, 1041 (1995); *MacNamara v. Gustin,* No. 17575, 1999 WL 355844, at *6 (Ohio Ct.App. June 4, 1999). No immunity shields him from trial.

\* \* \*

It is well to remember that the officers may not have done anything wrong. They may have diligently pursued an armed-robbery suspect, used a reasonable amount of force in a chaotic situation to detain him, and eased up seconds later once they found out he did not commit the robbery. That's exactly what their testimony suggests, and they will have the chance to give their version of events to a jury. But because we must accept the *plaintiffs'* evidence-supported story at this stage of the case, we agree with the district court that the officers do not deserve summary judgment on these claims.

For these reasons, we affirm.