RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0044p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

SHIRLEY BROWN, Individually and as Administratrix
of the Estate of Rodney Brown,

        *Plaintiff-Appellant*,

   *v.*

MICHAEL CHAPMAN; BELAL ILAIN; ERIK MELENDEZ;
CITY OF CLEVELAND,

        *Defendants-Appellees*.

No. 15-3506

―――――――――――

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:11-cv-01370—Lesley Wells, District Judge.

Argued: December 4, 2015

Decided and Filed: February 19, 2016

Before: MOORE, CLAY, and GILMAN, Circuit Judges.

―――――――――――

## COUNSEL

**ARGUED:** Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH, CO LPA, Cincinnati, Ohio, for Appellant. John P. Bacevice, Jr., CITY OF CLEVELAND, Cleveland, Ohio, for Appellees. **ON BRIEF:** Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH, CO LPA, Cincinnati, Ohio, for Appellant. John P. Bacevice, Jr., Aikaterini Houston, CITY OF CLEVELAND, Cleveland, Ohio, for Appellees.

1

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.  Rodney Brown died after police officers tasered him, physically subdued him, and placed him in a patrol car.  His mother, Shirley Brown, filed a lawsuit against the police officers involved and the City of Cleveland, alleging violations of the Fourth and Eighth Amendments.  Defendants filed a joint motion for summary judgment, claiming qualified immunity and denying municipal liability.  The district court granted in part and denied in part defendants' summary judgment motion and granted certification pursuant to Federal Rule of Civil Procedure 54(b), and plaintiff appealed.  We now **REVERSE** the district court's partial grant of summary judgment.

## I.  BACKGROUND

### A.  Factual Background

On December 31, 2010, at 8:45 P.M., Rodney Brown was driving westbound on Regalia Avenue in Cleveland, Ohio.  R. 27-15 (Synopsis at 1) (Page ID #927); *see also* R. 27-2 (Map) (Page ID #869).  Officers Michael Chapman and Belal Ilain, who were driving southbound on East 112th Street toward Regalia Avenue, claim that they saw Brown driving with no headlights on.  R. 27-15 (Synopsis at 1) (Page ID #927); *see also* R. 27-2 (Map) (Page ID #869).  When Brown turned south on East 113th Street, the officers followed, trailing him for two blocks before activating their siren.  R. 27-15 (Synopsis at 1) (Page ID #927).  Brown stopped his vehicle at the corner of East 113th Street and Benham Avenue.  *Id.*; *see also* R. 27-2 (Map) (Page ID #869).  Two eyewitnesses, who live in the area and had heard the siren, say that the vehicle's headlights were on.  R. 33-8 (Ellston Decl. ¶ 4) (Page ID #1144); R. 33-9 (Vaughn Decl. ¶ 4) (Page ID #1146).  Brown's home was just a few blocks away.  R. 25-2 (Chapman Dep. at 27–28) (Page ID #164–165).

Chapman approached the driver's side of the vehicle and Ilain approached the passenger's side.  R. 27-15 (Synopsis at 1) (Page ID #927).  The officers claim that Brown asked them whether they knew who he was, *id.*, though the eyewitnesses state that Brown only asked

the officers why they pulled him over, R. 33-8 (Ellston Decl. ¶ 6) (Page ID #1144); R. 33-9 (Vaughn Decl. ¶ 6) (Page ID #1146). Brown's right hand was under his left thigh, prompting Chapman to draw his gun. R. 27-15 (Synopsis at 1) (Page ID #927). Chapman ordered Brown to place both of his hands on the steering wheel. *Id.* Brown complied. *Id.*

In their initial summary of the events, the officers said that Chapman asked Brown for his driver's license and that Brown reached for the vehicle's glove box but did not open it. *Id.* Chapman later testified that at this point Brown "started having words with" Ilain. R. 25-2 (Chapman Dep. at 14) (Page ID #151). Ilain did not mention these words in his deposition and instead testified that Brown was making noises indicating he was frustrated. R. 25-3 (Ilain Dep. at 11) (Page ID #287). Ilain further testified that, contrary to the summary submitted by the officers, Brown opened the glove box and spent so much time digging through it that Ilain was nervous that Brown would pull out something other than a license and registration. *Id.* at 11–12 (Page ID #287–88). The officers' testimony is consistent, however, as to what happened next: Chapman ordered Brown to exit the vehicle. R. 25-2 (Chapman Dep. at 14) (Page ID #151); R. 25-3 (Ilain Dep. at 13–14) (Page ID #289–90).

The officers contend that Brown complied but was combative, slamming the driver's side door and walking toward Chapman "in an aggressive manner." R. 27-15 (Synopsis at 1) (Page ID #927); *see also* R. 25-2 (Chapman Dep. at 14) (Page ID #151); R. 25-3 (Ilain Dep. at 14) (Page ID #290). The eyewitnesses do not mention this behavior, and instead state that Brown followed the officers' instructions. R. 33-8 (Ellston Decl. ¶ 6) (Page ID #1144); R. 33-9 (Vaughn Decl. ¶ 7) (Page ID #1146). Chapman ordered Brown to walk to the back of the vehicle and put his hands on the trunk. R. 27-15 (Synopsis at 1) (Page ID #927). Brown complied. *Id.* The officers started to pat him down, intending to arrest him for not producing a driver's license. R. 25-2 (Chapman Dep. at 14–15) (Page ID #151–52); R. 25-3 (Ilain Dep. at 14) (Page ID #290).

From here, the officers' account and the eyewitnesses' account diverge significantly. According to the officers, as soon as they tried to put Brown's arms behind his back, he threw them off of him, backing away ten or fifteen feet. R. 25-2 (Chapman Dep. at 15) (Page ID #152); R. 25-3 (Ilain Dep. at 14) (Page ID #290). Chapman pulled out his taser, pointed it at Brown, and told him to get down on the ground. R. 27-15 (Synopsis at 1) (Page ID #927).

Brown remained standing, and took a step toward Chapman. *See id.*; R. 25-2 (Chapman Dep. at 15) (Page ID #152). Ilain warned Brown that the officers would taser him. R. 25-3 (Ilain Dep. at 19) (Page ID #295). Chapman issued a second command to get down on the ground but Brown took another step toward Chapman. R. 25-2 (Chapman Dep. at 15) (Page ID #152). Chapman aimed his taser at Brown's chest and pulled the trigger. *Id.* Data downloaded from Chapman's taser shows it was discharged for seven seconds at 8:47:33 P.M., two minutes after the officers pulled Brown over. R. 25-17 (Chapman Taser Information) (Page ID #851).

According to the eyewitnesses, while patting him down, Chapman struck Brown in the back of his neck with Chapman's elbow and pushed Brown onto the vehicle. R. 33-8 (Ellston Decl. ¶ 8) (Page ID #1144); R. 33-9 (Vaughn Decl. ¶ 7) (Page ID #1146). Brown broke away in response to the blows. R. 33-8 (Ellston Decl. ¶ 8) (Page ID #1144); R. 33-9 (Vaughn Decl. ¶ 8) (Page ID #1146). He then stood and faced the officers. R. 33-8 (Ellston Decl. ¶ 8) (Page ID #1144); R. 33-9 (Vaughn Decl. ¶ 8) (Page ID #1146). Neither eyewitness describes Brown as advancing toward Chapman and both eyewitnesses affirmatively state that they did not hear Chapman warn Brown before he fired his taser. R. 33-8 (Ellston Decl. ¶ 9) (Page ID #1145); R. 33-9 (Vaughn Decl. ¶ 9) (Page ID #1147). When the taser's probes hit him, Brown leaned forward but did not fall over. R. 33-9 (Vaughn Decl. ¶ 10) (Page ID #1147). Brown then turned away from the officers and ran down Benham Street. *Id.*; *see also* R. 27-2 (Map) (Page ID #869). The eyewitnesses, who were watching the events unfold from their home, could not see the chase that followed.

Chapman and Ilain chased Brown down Benham Street, and Ilain fired his taser at Brown's back. R. 27-15 (Synopsis at 1) (Page ID #927). Ilain reached Brown first, grabbing his shoulders and head and tackling him to the ground. *Id.* Chapman joined Ilain, and the two officers attempted to handcuff him. *Id.* at 2 (Page ID #928). According to the officers, Brown resisted, punching and kicking them. R. 25-2 (Chapman Dep. at 16) (Page ID #153); *see also* R. 25-3 (Ilain Dep. at 32) (Page ID #308). Brown apparently also hit Ilain on the head with a hard object, though none of the depositions or documents specify what this object was or whether it was recovered. (Synopsis at 2) (Page ID #928); *see also* R. 25-2 (Chapman Dep. at 16) (Page ID #153); R. 25-3 (Ilain Dep. at 31) (Page ID #307). The officers found a nylon pouch containing a

folding knife in Brown's left hand.  R. 27-15 (Synopsis at 2) (Page ID #928).  Ilain testified that, upon seeing the pouch, Chapman said "I'm going to shoot him, I'm going to shoot him," and that in response Ilain grabbed the pouch out of Brown's hand and threw it.  R. 25-3 (Ilain Dep. at 31) (Page ID #307).

In order to subdue Brown, both officers used their tasers in drive-stun mode.[1]  R. 27-15 (Synopsis at 2) (Page ID #928).  Data downloaded from Chapman's taser shows that he used it twice, at 8:48:11 and at 8:48:17 P.M.  R. 25-17 (Chapman Taser Information) (Page ID #851).  At 8:48:20 P.M., only a few seconds later, Ilain requested backup.  R. 25-1 (Radio Event Chronology at 1) (Page ID #130).  Data downloaded from Ilain's taser shows that he used his taser shortly thereafter, at 8:49:08 P.M.[2]  R. 25-18 (Ilain Taser Information) (Page ID #852).  Additional officers arrived on the scene and helped Chapman and Ilain handcuff Brown.  R. 27-15 (Synopsis at 2) (Page ID #928).  Richard Rusnak and James Merritt arrived first; Mark

---

[1]Both Chapman and Ilain were using a Taser X26.  *See* R. 25-17 (Chapman Taser Information) (Page ID #851); R. 25-18 (Ilain Taser Information) (Page ID #852).  The X26, like most other tasers, has two modes:  dart mode and drive-stun mode.  In *Bryan v. MacPherson*, the Ninth Circuit described the type and amount of force delivered by a Taser X26 in dart mode:

> The X26 uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires—toward the target at a rate of over 160 feet per second.  Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles.  The impact is as powerful as it is swift.  The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless.  The tasered person also experiences an excruciating pain that radiates throughout the body.

630 F.3d 805, 824 (9th Cir. 2010) (internal citations and footnotes omitted).  In a later case, the Ninth Circuit described the force delivered by a taser in drive-stun mode:

> When a taser is used in drivestun [sic] mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim.  In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode.

*Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc).

[2]There are some inconsistencies between the officers' testimony and the data downloaded from their tasers.  Data downloaded from Chapman's taser shows he fired his first shot at Brown at 8:47:33 P.M.  R. 25-17 (Chapman Taser Information) (Page ID #851).  But four of Ilain's five recorded uses occurred *before* 8:47:33 PM:  at 8:46:43 P.M., 8:47:07 P.M., 8:47:13 P.M., and 8:47:19 P.M.  R. 25-18 (Ilain Taser Information) (Page ID #852).  This conflicts with the officers' testimony that Chapman fired his taser first, that Ilain fired his taser second, and that Ilain then used his taser several more times while the officers were struggling to handcuff Brown.  *See* R. 25-3 (Ilain Dep. at 29, 32–33) (Page ID #305, 308–09) (testifying that he deployed his taser "almost immediately after [Brown] turned and started to run" and that he "tried to drive stun [Brown] a couple times").  Ilain offers no explanation for these inconsistencies.  *See id.* at 40–41 (Page ID #316–17).

Blaine, Erik Melendez, and other officers arrived later.  R. 25-8 (Rusnak Dep. at 6, 25) (Page ID #556, 575); *see also* R. 25-5 (Melendez Dep. at 31) (Page ID #458).

The officers notified dispatch that they had successfully handcuffed Brown at 8:52 P.M., seven minutes after Chapman and Ilain first pulled him over.  R. 4 (Tr. of Dispatch Audio at 2) (Page ID #13).  Immediately after they handcuffed him, Brown told them he was having trouble breathing:

| VOICE: | Okay.  Male's in custody.  Slow it down.  Slow it down.  Male's in custody at 20:52. |
| --- | --- |
| VOICE: | All right.  Radio any car in the area of 3038 East 125 downstairs. |
| VOICE: | Over here. |
| VOICE: | Be careful. |
| VOICE: | I can't breathe. |
| VOICE: | So?  Who gives a fuck. |
| VOICE: | Not here.  Be careful. |
| VOICE: | (inaudible). |
| VOICE: | I can't breathe, man. |
| VOICE: | You got his (inaudible) on him? |
| VOICE: | (inaudible). |

*Id.* at 2–3 (Page ID #13–14).  Melendez was the one who replied, "So?  Who gives a fuck."  R. 25-5 (Melendez Dep. at 37) (Page ID #464).  Melendez later testified that, in addition to Brown telling the officers he could not breathe, Brown was making grunting noises.  *Id.* at 36 (Page ID #463).

Rusnak, Merritt, Blaine, and Melendez escorted Brown to Rusnak and Merritt's patrol car.  R. 25-8 (Rusnak Dep. at 23–24) (Page ID #573–74).  Brown went limp before he reached it, and the officers had to go around to the other side of the car and drag Brown onto the back seat. R. 27-15 (Synopsis at 2) (Page ID #928); R. 25-7 (Merritt Dep. at 13) (Page ID #525); R. 25-10 (Kincaid Dep. at 12–13, 37) (Page ID #672–73, 697).  Once Brown was inside, the officers closed the patrol car's doors.  R. 25-7 (Merritt Dep. at 13) (Page ID #525).

At 8:55 P.M., Rusnak used his radio to request EMS, and told the dispatcher that officers had tasered Brown but that he was conscious and breathing.  R. 25-1 (Radio Event Chronology at 2)

(Page ID #131); R. 28-8 (Rusnak Dep. at 32–34) (Page ID #582–84). In his deposition, Rusnak explained that this was department policy, and that he did not request EMS in response to any physical symptoms Brown exhibited. R. 28-8 (Rusnak Dep. at 32) (Page ID #582). EMS was not notified until 9:00 PM. R. 25-1 (Radio Event Chronology at 2) (Page ID #131).

Rusnak and Merritt stayed by their patrol car for the remainder of the night, watching Brown as his condition deteriorated. R. 25-7 (Merritt Dep. at 14–18) (Page ID #526–30); R. 25-8 (Rusnak Dep. at 34–36) (Page ID #584–86). At one point, Merritt heard Brown say he was having trouble breathing, so Merritt rolled down the back windows halfway. R. 25-7 (Merritt Dep. at 14) (Page ID #526). Rusnak shined his flashlight into Brown's eyes, and Brown's pupils did not constrict.[3] R. 25-8 (Rusnak Dep. at 29) (Page ID #579). Rusnak also asked Brown questions in an attempt to engage him, but Brown gave unintelligible answers. *Id.* at 29–30 (Page ID #579–80). Merritt thought Brown seemed confused. R. 25-7 (Merritt Dep. at 15) (Page ID #527).

Melendez was also near the patrol car, and at one point asked Rusnak what Brown was doing. R. 25-5 (Melendez Dep. at 47) (Page ID #474). Rusnak informed Melendez that Brown was still grunting. *Id.* John Sattler, a sergeant, testified that when he arrived he saw Brown sitting in the back of the patrol car, slumped over and unresponsive. R. 25-15 (Sattler Dep. at 12–13) (Page ID #830–31).

EMS arrived at 9:07 P.M., seven minutes after they were notified and twelve minutes after Rusnak first requested medical aid over the radio. R. 27-14 (EMS Report at 1) (Page ID #923). EMS found Brown "propped up" on the curb, leaning against the leg of one of the officers. R. 25-12 (Fletcher Dep. at 19–20) (Page ID #757–58). Brown had no pulse, and EMS was unable to resuscitate him. R. 27-14 (EMS Report at 1) (Page ID #923).

**B. Procedural Background**

Brown's mother, Shirley Brown, filed a complaint on behalf of the Estate of Rodney Brown in the United States District Court for the Northern District of Ohio against named and

---

[3]Rusnak's actual testimony is that Brown's eyes "would not dilate" when he shined his flashlight at them; what Rusnak likely meant is that they would not constrict. *See* R. 25-8 (Rusnak Dep. at 29) (Page ID #579).

unnamed officers, alleging excessive force, assault and battery, and wrongful death.  R. 1 (Compl. ¶¶ 25–27) (Page ID #4–5).  The complaint also stated that the officers did not have probable cause to stop Brown's vehicle and that they were deliberately indifferent to Brown's safety, although it did not formally plead either claim.  *Id.* ¶¶ 16, 21, 22 (Page ID #3–4). Plaintiff amended her complaint once, identifying some of the unnamed officers and adding the City of Cleveland as a defendant.  R. 15 (First Am. Compl. at 1–2) (Page ID #58–59).

Defendants filed a motion for summary judgment on all claims.  R. 25 (Defs. Mot. for Summ. J.) (Page ID #92).  The officers argued that they were entitled to qualified immunity, and the City argued that plaintiff could not establish municipal liability.  *Id.* at 1 (Page ID #97). Defendants' motion also addressed plaintiff's allegations that the officers did not have probable cause to stop Brown and that they were deliberately indifferent to Brown's safety, even though, as previously noted, plaintiff's complaint did not formally plead either claim.  *Id.* at 12–13, 19–22 (Page ID #108–09, 115–18).

The district court recognized both claims and then granted in part and denied in part defendants' motion for summary judgment.  The district court found that Chapman and Ilain had probable cause to stop Brown and thus granted summary judgment for the officers and the City on that claim.  R. 38 (Dist. Ct. Op. at 9–11, 29) (Page ID #1229–31, 1249).  The district court further found that Chapman's use of his elbow to strike Brown in the back of the neck was not objectively reasonable and violated clearly established law, and denied summary judgment for Chapman and the City as to that part of plaintiff's excessive-force claim.  *Id.* at 12–13, 29 (Page ID #1232–33, 1249).  The district court found that Chapman's use of a taser to Brown's chest was objectively reasonable, however, and granted summary judgment for the officers and the City as to that part of plaintiff's excessive-force claim.  *Id.* at 14, 17, 29 (Page ID #1234, 1237, 1249).  Finally, the district court denied summary judgment to Rusnak, Merritt, Sattler, and the City on plaintiff's deliberate-indifference claim.  *Id.* at 27–29 (Page ID #1247–49).  The district court granted summary judgment to Melendez, however, concluding that he could not have known that Brown was struggling to breathe.  *Id.* at 23–24 (Page ID #1243–44).

The district court granted certification pursuant to Rule 54(b), directing entry of judgment against plaintiff on her claims that Chapman and Ilain did not have probable cause to stop

Brown, that Chapman's use of a taser constituted excessive force, and that Melendez was deliberately indifferent to Brown's medical needs. R. 46 (Dist. Ct. Order at 4) (Page ID #1279). Plaintiff timely appealed. R. 48 (Pl. Notice of Appeal) (Page ID #1281). Defendants Rusnak, Merritt, Sattler, and the City of Cleveland also appealed, but their arguments are considered in a separate opinion in No. 15-3158.

## II. ANALYSIS

### A. Qualified Immunity for Officers Chapman and Ilain

Section 1983 creates a private right of action against officials who, under color of state law, deprive individuals of their constitutional rights. 42 U.S.C. § 1983. Here, the police officers do not dispute that they were acting under color of state law at the time of the incident. Instead, they maintain that they did not deprive Brown of his constitutional rights, and they raise the defense of qualified immunity.

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A qualified-immunity inquiry involves two questions: whether defendants violated a constitutional right and whether that right was clearly established. *Pearson*, 555 U.S. at 232. On summary judgment, the court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 377 (2007); *see also Ortiz ex rel. Ortiz v. Kazimer*, No. 15-3453, 2016 WL 423741, at *1 (6th Cir. Feb. 4, 2016). These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages. *Pearson*, 555 U.S. at 236; *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

**1. Probable Cause**

**a. Violation of a Constitutional** Right

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Consistent with this guarantee, a police officer may stop a vehicle only if the officer "possess[es] either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012).

Defendants assert that it is undisputed that Brown was driving without headlights on, and that therefore the officers had probable cause to pull him over. Defs. Br. at 17–18. This assertion, however, ignores plaintiff's evidence. Both eyewitnesses, who did not see Brown's car before the police pulled him over but who saw it once it was stopped, said that Brown's headlights were on. R. 33-8 (Ellston Decl. ¶ 4) (Page ID #1144); R. 33-9 (Vaughn Decl. ¶ 4) (Page ID #1146). Chapman, the officer who went to Brown's side of the vehicle, testified that he did not tell Brown to turn his headlights on. R. 25-2 (Chapman Dep. at 22) (Page ID #159). Thus, plaintiff has submitted evidence that Brown's headlights were on immediately after the police pulled him over and that the police did not tell him to turn them on. Although a reasonable inference could be that Brown turned them on himself, an equally reasonable inference could be that they were on when the police pulled him over—and we are obligated to draw every reasonable inference in plaintiff's favor. Thus, defendants' assertion that the issue is undisputed is incorrect: plaintiff simply offers circumstantial as opposed to direct evidence. We conclude that this circumstantial evidence, taken as true for the purposes of a qualified-immunity analysis on summary judgment, would support a finding that the officers' actions violated the Fourth Amendment protection against unreasonable searches and seizures.

**b. Clearly Established**

The next question is whether, as of December 31, 2010, Brown had a clearly established right to be free from vehicle stops for civil traffic violations unsupported by probable cause. Plaintiff argues that he did, and defendants do not dispute this. Defs Br. at 17–19. We agree with plaintiff. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see also Whren v. United*

*States*, 517 U.S. 806, 810, 813 (1996) (holding that police may stop a vehicle when they have probable cause to believe a civil traffic violation has occurred, even if the stop was pretextual); *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004) (summarizing Sixth Circuit Fourth Amendment jurisprudence). Because evidence exists that would support a finding that Chapman and Ilain violated Brown's clearly established rights, they are not entitled to summary judgment regarding the claimed Fourth Amendment violation based on the vehicle stop.

### 2. Excessive Force

#### a. Violation of a Constitutional Right

To determine whether officers' use of force in effecting an arrest is excessive and thus in violation of the Fourth Amendment, a court must consider "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted). The court makes this evaluation "from the perspective of a reasonable officer on the scene" because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. "At the summary judgment stage, . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, . . . the reasonableness of [the defendants'] actions . . . is a pure question of law." *Scott*, 550 U.S. at 381 n.8 (emphasis removed); *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009).

This evaluation is not confined to the facts and circumstances confronting the officers, however. It also considers the *effects* of their actions, as any inquiry into a violation of the Fourth Amendment "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)); *see also United States v. Place*, 462 U.S. 696, 703 (1983). "[T]he ultimate question is whether the

totality of the circumstances justifies a particular sort of seizure." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (internal quotation marks omitted).

Here, the intrusion on Brown's Fourth Amendment interests was significant. Chapman initially fired the taser in dart mode directly at Brown's chest. R. 25-2 (Chapman Dep. at 15) (Page ID #152). As described earlier:

> Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles. The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless. The tasered person also experiences an excruciating pain that radiates throughout the body.

*Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010) (internal citations and footnotes omitted). As for the governmental interests, factors that guide this analysis include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

### i. Severity of the Crime

The first factor—the severity of Brown's crime—weighs against a finding that Chapman's use of force was objectively reasonable. Defendants contend that Brown was driving without his headlights on and that, once stopped, he refused to provide identification. R. 27-15 (Synopsis at 1); R. 25-2 (Chapman Dep. at 24–25) (Page ID #161–62); R. 25-3 (Ilain Dep. at 12) (Page ID #288). Neither one of these crimes—both misdemeanors—is severe enough to warrant the use of a taser.

Defendants also contend that Brown was driving under the influence of drugs. R. 25-2 (Chapman Dep. at 24–25) (Page ID #161–62); R. 25-3 (Ilain Dep. at 12) (Page ID #288). Though more serious than driving without headlights on or refusing to provide identification, this crime is also not severe enough to warrant the use of a taser. First, neither officer testified that Brown's driving put anyone in danger. Indeed, the officers did not even observe anything unusual about Brown's driving. They suspected that Brown was under the influence of drugs

only after they pulled him over and noticed that he was speaking slowly and his "eyes were . . . wide open." R. 25-3 (Ilain Dep. at 11–12, 15) (Page ID #287–88, 291). Nor was there a chance that Brown's driving *would* put anyone in danger. Brown had complied with the officers' orders so far: he pulled over, stepped out of his vehicle, walked around to the back, and put his hands on the trunk. Even if he had stopped complying, there was little, if any, risk that Brown was going to drive off still under the influence of drugs. *See Eldridge v. City of Warren*, 533 F. App'x 529, 533 (6th Cir. 2013) (holding that police officers' belief that a suspect was driving while intoxicated did not justify their use of a taser when the suspect had stopped and it was clear he "was going nowhere").

### ii. Immediate Threat

The second *Graham* factor also weighs against a finding that the use of force was objectively reasonable. Defendants argue that Brown posed an immediate threat to the officers' safety, noting that Brown advanced on Chapman twice: once when he exited his vehicle and again immediately before Chapman tasered him. R. 27-15 (Synopsis at 1) (Page ID #927); *see also* R. 25-2 (Chapman Dep. at 14–15) (Page ID #151–52); R. 25-3 (Ilain Dep. at 14, 19) (Page ID #290, 295). Defendants also emphasize Brown's size and suspected strength. R. 25-2 (Chapman Dep. at 41) (Page ID #178). Plaintiff, however, has submitted two declarations from eyewitnesses describing Brown as cooperative up until the point Chapman hit Brown in the back of his neck. R. 33-8 (Ellston Decl. ¶¶ 6–9) (Page ID #1144–45); R. 33-9 (Vaughn Decl. ¶¶ 6–9) (Page ID #1146–47). The declarations also state that, although Brown broke free from the officers after Chapman hit him, he was facing them and standing still when Chapman tasered him. R. 33-8 (Ellston Decl. ¶ 8) (Page ID #1144); R. 33-9 (Vaughn Decl. ¶ 8) (Page ID #1146). When the facts are taken in the light most favorable to the plaintiff, a jury could find that Brown did not pose an immediate threat to the safety of the officers or to others that would justify the use of a taser.

### iii. Actively Resisting or Evading Arrest

The heart of the parties' dispute is over the third factor—whether Brown was actively resisting arrest or attempting to evade arrest by flight. Defendants argue that Brown resisted

arrest by refusing to let the officers handcuff him.   Defs. Br. at 22–25; *see also* R. 25-2 (Chapman Dep. at 15) (Page ID #152); R. 25-3 (Ilain Dep. at 14) (Page ID #290).   Defendants also argue that Brown resisted by taking two steps toward Chapman when Chapman ordered him to get down on the ground.[4]  R. 25-2 (Chapman Dep. at 15) (Page ID #152); R. 25-3 (Ilain Dep. at 19) (Page ID #295).   Plaintiff claims that Brown was never resisting arrest, and that he broke away from the officers only to avoid further injury.   R. 33-9 (Vaughn Decl. ¶¶ 6–8) (Page ID #1146).   Plaintiff also maintains that Brown was standing still when Chapman tasered him.   R. 33-8 (Ellston Decl. ¶ 8) (Page ID #1144); R. 33-9 (Vaughn Decl. ¶ 8) (Page ID #1146).

The parties' dispute is resolved by the constraints placed on this court at this point in the litigation.   We are obligated to take the plaintiff's facts as true and make all reasonable inferences from those facts in her favor.   Accordingly, for the purposes of summary judgment, we assume that the facts show that Brown broke away from the officers in order to avoid further injury, that he was standing still at the time Chapman tasered him, and that therefore Brown was not actively resisting or evading arrest.   Thus, a jury could find that Chapman's actions were not objectively reasonable in light of the facts and circumstances confronting him.

### b. Clearly Established

The next question is whether "the right was clearly established at the time of the alleged violation."  *Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012).   Mindful of the need to define the right narrowly, *see Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011), we frame this question as whether Brown's right not to be tasered, after having broken away from police officers but while not threatening others or actively resisting arrest, was clearly established as of December 31, 2010.

Our task is to determine whether the contours of this right were sufficiently defined to give a reasonable officer fair warning that the conduct at issue was unconstitutional.   "This is not

---

[4]Defendants devote much of their argument to what they characterize as Brown's continued resistance:  his flight and subsequent struggle with Chapman and Ilain while the officers tried to handcuff him.  Defs. Br. at 23–25. Because the only taser deployment at issue is Chapman's initial taser deployment, *see* R. 33 (Resp. to Mot. for Summ. J. at 10–11) (Page ID #1095–96), these facts are not relevant, *see Graham*, 490 U.S. at 396 (explaining that courts consider reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks and citations omitted). In other words, "there need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (*quoting Hope*, 536 U.S. at 741). "In determining whether a right was clearly established, we look first to decisions of the Supreme Court, then to our own precedents, and then to decisions of other courts of appeal, and we ask whether these precedents 'placed the . . . constitutional question beyond debate.'" *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013) (quoting *al-Kidd*, 131 S. Ct. at 2083); *see also Andrews v. Hickman Cty.*, 700 F.3d 845, 853 (6th Cir. 2012).

In conducting this analysis, two lines of cases emerge. The first line of cases has held that there is no clearly established right not to be tasered when a suspect is actively resisting arrest. *See, e.g., Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 95–97 (6th Cir. 2012) (concluding that, as of 2009, a suspect who refused to follow police orders and move his arms out from underneath his body and was actively resisting arrest did not have a clearly established right not to be tasered); *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509–11 (6th Cir. 2012) (finding that, as of 2007, a suspect who refused to be handcuffed and actively resisted arrest did not have a clearly established right not to be tasered); *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495–96 (6th Cir. 2012) (holding that a non-violent but fleeing suspect did not have a clearly established right not to be tasered as of 2008); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044–45 (6th Cir. 1992) (finding that police officers who tasered a potentially homicidal man who stood a few feet away with a knife in each of his hands did not violate clearly established law).

The second line of cases has held that an individual's right to be free from a taser is clearly established when the individual is not actively resisting arrest or is already detained. *See, e.g., Thomas v. Plummer*, 489 F. App'x 116, 126–29 (6th Cir. 2012) (concluding that, as of 2009, an officer's use of a taser on a once-disobedient suspect who had stopped resisting violated

clearly established law); *Kijowski v. City of Niles*, 372 F. App'x 595, 600–01 (6th Cir. 2010) (holding that officers violated clearly established rights when they dragged an unresisting man from his truck and tasered him); *Landis v. Baker*, 297 F. App'x 453, 461–64 (6th Cir. 2008) (finding that officers violated clearly established law by tasering a suspect who had previously grabbed a police officer but had since released him and was "no longer a threat to any of the officers" as he was "not belligerent or verbally resistant" and did not have a weapon).

The right articulated above fits squarely within this second line of cases: as of December 31, 2010, it was clearly established that tasering a non-threatening suspect who was not actively resisting arrest constituted excessive force. Accordingly, Chapman is not entitled to summary judgment regarding the claimed Fourth Amendment violation based on his use of a taser.[5]

## B. Municipal Liability

To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged violation occurred because of a municipal policy, practice, or custom; a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *see also Connick v. Thompson*, 563 U.S. 51, 60 (2011). Beyond having to identify "conduct properly attributable to the municipality," a plaintiff "must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Board of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). In other words, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

### 1. Probable Cause

In addition to reversing the district court's grant of summary judgment to the officers, plaintiff asks this court to reverse the district court's grant of summary judgment to the City of

---

[5]Our ruling leaves open the possibility that Ilain is also liable for Chapman's use of excessive force under a failure-to-protect theory—an argument that plaintiff raised in her response to defendants' motion for summary judgment, *see* R. 33 (Resp. to Mot. for Summ. J. at 21) (Page ID #1106), but that the district court did not reach after concluding that Chapman was entitled to qualified immunity, *see* R. 38 (Dist. Ct. Op. at 17–18) (Page ID #1237–38).

Cleveland because the City "ratified" the officers' conduct by failing to investigate it. This theory of municipal liability, however, applies only when the ratification was carried out by an official with final decision-making authority. *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir.), *cert. denied*, 135 S. Ct. 758 (2014); *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013); *see also Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989); *Marchese v. Lucas*, 758 F.2d 181, 188–89 (6th Cir. 1985). Plaintiff does not name a final decisionmaker, but rather alleges that the Cleveland police department, as a whole, ratified the officers' conduct. Pl. Br. at 46. This is insufficient to establish the requisite degree of culpability. Plaintiff offers no other theory of municipal liability. *See id.* Therefore, we cannot reverse the district court's grant of summary judgment to the City of Cleveland on plaintiff's probable-cause claim.

### 2. Excessive Force

Plaintiff also argues that the City of Cleveland is liable for Chapman's use of excessive force. Plaintiff offers three different theories of municipal liability: that the City's taser policy was unlawful, that the City inadequately trained its officers, and that the City ratified Chapman's violation of Brown's constitutional rights by not conducting a thorough investigation. *Id.* at 31. Plaintiff's ratification theory fails because, as discussed above, it requires that plaintiff make allegations against a specific final decisionmaker and plaintiff does not make those allegations. This leaves two theories of liability.

### a. Taser Policy

Here, plaintiff must demonstrate "a direct causal link between the policy and the alleged constitutional violation" in order to show that the municipality's "deliberate conduct can be deemed the moving force behind the violation." *Graham ex. rel. Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (internal quotation marks omitted).

Plaintiff claims that the taser policy in place at the time of Brown's death dictated that officers discharge their tasers at "center mass." Pl. Br. at 32; *see also* R. 25-3 (Ilain Dep. at 23) (Page ID #299). Because Chapman fired his taser at Brown's chest, plaintiff argues that this policy was the "moving force" behind the constitutional violation. Pl. Br. at 32. For the

purposes of summary judgment, we agree.    When viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that the City's taser policy was the moving force behind the violation of Brown's Fourth Amendment rights.

### b.  Inadequate Training

Inadequate training may serve as the basis for § 1983 liability where it "amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  This requirement ensures that these claims stay within the parameters drawn in *Monell*, as "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  *Id.* at 389.

In order to impose liability on the City of Cleveland, plaintiff must show "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [City's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury."  *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (internal quotation marks omitted).

Plaintiff meets the first prong easily with her argument that the City did not adequately train its officers how to use a taser—a task they are required to perform.  Pl. Br. at 36.  As for the second prong, we have interpreted *City of Canton v. Harris* "as recognizing at least two situations in which inadequate training could be found to be the result of deliberate indifference." *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003).  "'One is failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction,' as would be the case, for example, if a municipality failed to instruct its officers in the use of deadly force," and a second is "'where the city fails to act in response to repeated complaints of constitutional violations by its officers.'"  *Id.* (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)).  Plaintiff does not allege that the City of Cleveland "fail[ed] to act in response to repeated complaints of constitutional violations by its officers."  *See id.*  Thus, she must show that the City "fail[ed] to provide adequate training in light of foreseeable consequences."  *Id.*

Plaintiff notes that although Taser International, Inc. (the company that makes the City's tasers) updated its training materials several times before December 31, 2010, the City continued to use old training materials. The difference, plaintiff contends, is significant. The updated materials told officers to avoid chest shots when possible in order to "reduce[] the risk of affecting the heart." R. 33-4 (Taser Training Materials Version 17 at 3) (Page ID #1129). The old materials said that "[t]he effective target zone for the TASER device is almost the entire body," with the exceptions being the head and throat. R. 33-3 (Taser Training Materials Version 15) (Page ID #1126). In September 2010, the City's police department trained Chapman using the old materials even though updated materials had been available since May 2010. R. 27-5 (Chapman Taser Certification Test at 1–2) (Page ID #889–90) (showing that, on September 16, 2010, the City trained Chapman using version 15 of Taser's training materials). Thus, just months before Chapman's altercation with Brown, the City instructed Chapman that it was safe to discharge his taser at a suspect's chest. Plaintiff argues that the consequences of this inadequate training—that officers would discharge their tasers at suspects' chests—were foreseeable. We agree.

Finally, plaintiff must show "that the inadequacy is closely related to or actually caused [the] injury." *Plinton*, 540 F.3d at 464 (internal quotation marks omitted). Here, the inadequacy is due to the program's failure to instruct officers to avoid discharging their tasers at suspects' chests, and the intrusion on Brown's Fourth Amendment rights involved the discharge of a taser at his chest. Accordingly, we conclude that, when viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find that there was a direct causal link between the City's inadequate training and the intrusion on Brown's Fourth Amendment rights. Thus, we reverse the district court's grant of summary judgment to the City on plaintiff's excessive-force claim.

## C. Summary Judgment on Deliberate-Indifference Claim Against Melendez

We review a district court's grant of summary judgment de novo. *Paterek v. Vill. of Armada*, 801 F.3d 630, 645 (6th Cir. 2015). Summary judgment obviates the need for a trial when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). To determine whether a genuine dispute of material fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott*, 550 U.S. at 378.

Plaintiff asks this court to reverse the district court's finding that there was no genuine dispute of material fact as to whether Melendez, the officer who responded to Brown's statement that he could not breathe with "So? Who gives a fuck," was deliberately indifferent to Brown's medical need. Pl. Br. at 39–45.

Deliberate indifference constitutes "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted). "Although the Eighth Amendment's protections apply specifically to post-conviction inmates, the Due Process Clause of the Fourteenth Amendment operates to guarantee those same protections to pretrial detainees as well." *Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005) (internal citation omitted).

A deliberate-indifference claim has two components—one objective and one subjective. The objective component considers whether the medical need at issue was "sufficiently serious." *Comstock v. McCrary*, 273 F.3d 693, 702–03 (6th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The subjective component considers whether the official "subjectively perceived facts from which to infer substantial risk to the [detainee], that he did in fact draw the inference, and that he then disregarded that risk." *Id.* at 703 (citing *Farmer*, 511 U.S. at 837).

Although the district court concluded that plaintiff satisfied the objective component for the purposes of summary judgment, and that there was a genuine dispute of material fact as to whether Merritt, Rusnak, and Sattler were deliberately indifferent to Brown's medical needs—it granted summary judgment to Melendez. R. 38 (Dist. Ct. Op. at 22–28) (Page ID #1242–48).

The district court reasoned that, "[e]ven though the decedent told Officer Melendez he could not breathe, the circumstances were such that Officer Melendez could not have reasonably inferred that the decedent was suffering from a serious medical condition at that time." *Id.* at 23 (Page ID #1243). The district court explained that it was "undisputed" that Brown "continued to actively resist the officer's [sic] efforts to restrain him up until they placed him in the back of the police car." *Id.*

This conclusion ignores crucial evidence. Rusnak testified that when he and Brown were seven or eight feet from Rusnak and Merritt's patrol car, Melendez and Blaine stepped in and "took him . . . the rest of the distance." R. 25-8 (Rusnak Dep. at 23–24) (Page ID #573–74). Although Melendez testified that he walked Brown only "two to three feet" before letting other officers take over, R. 25-5 (Melendez Dep. at 37, 40–41) (Page ID #464, 467–68), Rusnak's testimony indicates that Melendez was with Brown when he went limp and the officers had to drag him onto the backseat of the patrol car, *see* R. 27-15 (Synopsis at 2) (Page ID #928); R. 25-7 (Merritt Dep. at 13) (Page ID #525); R. 25-10 (Kincaid Dep. at 12–13, 37) (Page ID #672–73, 697). Melendez also acknowledged that, after Brown had been in the patrol car for a few minutes, Melendez walked over to the car and stood behind it. R. 25-5 (Melendez Dep. at 46–47) (Page ID #473–74). While there, Melendez discussed Brown's condition with Rusnak, and Rusnak told him that Brown was grunting. *Id.* at 47 (Page ID #474). During his deposition, Melendez confirmed that these were the same type of grunts he heard Brown make immediately after Brown told Melendez that he could not breathe. *Id.* at 48 (Page ID #475).

Viewing this evidence in the light most favorable to plaintiff, a jury could find that Melendez "subjectively perceived facts from which to infer substantial risk to [Brown], that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 837). Brown told Melendez that he could not breathe. R. 4 (Tr. of Dispatch Audio at 2–3) (Page ID #13–14). Melendez also heard Brown grunting, was with him when he collapsed and when officers had to drag him onto the backseat of a patrol car, and even checked in on him later that night to find he was still grunting. R. 25-5 (Melendez Dep. at 46–48) (Page ID #473–75); R. 25-8 (Rusnak Dep. at 23–24) (Page ID #573–74). That Brown "continued to actively resist the officer's [sic] efforts to restrain him up until they placed him in

the back of the police car," *see* R. 38 (Dist. Ct. Op. at 22–28) (Page ID #1242–48), does not foreclose the possibility that Melendez knew Brown needed medical help. Accordingly, we reverse the district court's grant of summary judgment to Melendez on plaintiff's deliberate-indifference claim.

## III. CONCLUSION

For the reasons stated above, we **REVERSE** the district court's grant of summary judgment to the officers on plaintiff's claim that the officers stopped Brown's vehicle without probable cause, but **AFFIRM** the district court's finding that the City is not liable on that claim. We further **REVERSE** the district court's grant of summary judgment to Chapman on plaintiff's claim that Chapman's use of a taser constituted excessive force and **REVERSE** the district court's finding that the City is not liable on that claim. Finally, we **REVERSE** the district court's grant of summary judgment to Melendez on plaintiff's deliberate-indifference claim.