RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0185p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LAMAR WRIGHT,

　　　　　　　　　　*Plaintiff-Appellant*,

　　*v.*

　　　　　　　　　　　　　　　　　　　　　　　No. 19-3452

CITY OF EUCLID, OHIO; KYLE FLAGG; VASHON
WILLIAMS,

　　　　　　　　　　*Defendants-Appellees*.

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:17-cv-02503—Donald C. Nugent, District Judge.

Argued: January 28, 2020

Decided and Filed: June 18, 2020

───────────────

## COUNSEL

**ARGUED:** Jacqueline C. Greene, FRIEDMAN & GILBERT, Cleveland, Ohio, for Appellant.
Frank H. Scialdone, MAZANEC, RASKIN AND RYDER CO., L.P.A., Cleveland, Ohio, for
Appellees. **ON BRIEF:** Jacqueline C. Greene, Sarah Gelsomino, Terry H. Gilbert,
FRIEDMAN & GILBERT, Cleveland, Ohio, for Appellant. Frank H. Scialdone, James A.
Climer, John D. Pinzone, MAZANEC, RASKIN AND RYDER CO., L.P.A., Cleveland, Ohio,
for Appellees.

───────────────

## OPINION

───────────────

　　JOHN K. BUSH, Circuit Judge. This appeal involves a Chris Rock video and a cartoon,
but it is no laughing matter. In fact, this case raises a gravely important issue—police use of

force—that has dominated the nation's attention in recent weeks.  Lamar Wright, an African American man, brought claims under 42 U.S.C. § 1983 of unconstitutional excessive force, false arrest, malicious prosecution, and municipal liability, along with state-law claims, relating to the actions of certain police officers and other officials employed by the City of Euclid, Ohio.

The police officers, in plain clothes, approached Wright's parked SUV with weapons drawn.  Thinking he was about to be robbed, Wright tried to back up the vehicle to get away.  A flash of a badge made him realize that the men he thought were about rob him were the police.  Wright stopped the SUV, and the officers pulled open the driver's side door.  Wright had no weapon, and the officers holstered theirs.  Nonetheless, they simultaneously deployed a taser against him and pepper-sprayed him at point-blank range, all while he remained seated in the vehicle.  Wright had trouble getting out of the SUV because of a colostomy bag stapled to the right side of his abdomen.  He was recovering from a medical operation for diverticulitis.  The police aggravated the staples from his surgery, causing bleeding from around the bag.

The officers then arrested Wright even though there was arguably no probable cause for the arrest.  The officers designated Wright's arrest as arising from a drug investigation, even though they found no drugs on him.  This designation resulted in Wright's being detained for more than nine hours and subjected to an intrusive body scan for drugs well after the officers knew of Wright's medical condition.  The scan revealed no drugs, and no drug-related charges were ever brought against him.

The district court granted summary judgment to the officers on the basis of qualified immunity, and to the City based on *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978).  As explained below, we disagree with the district court's qualified immunity analysis.  With respect to the *Monell* claim, the evidence against the City includes the Chris Rock video, played as part of its use-of-force training for officers, in which the comedian makes remarks about Rodney King and police misconduct that are highly inappropriate for law-enforcement instruction.  The proof also includes an offensive cartoon in the City's police-training manual that portrays an officer in riot gear beating a prone and unarmed civilian with a club, with the caption "protecting and serving the poop out of you."  R. 23 at PageID 808.  Based on this

evidence and more, we find that Wright has introduced sufficient evidence of municipal policy to satisfy *Monell*.

For the reasons set forth below, we **AFFIRM** in part and **REVERSE** in part the district court's judgment, and **REMAND** for further proceedings consistent with this opinion.

## I.

### A.    Wright's Stop, Arrest and Experience in Custody

On November 4, 2016, at around 6:00 p.m., Lamar Wright pulled an SUV onto a residential  driveway off of 207th Street in Euclid, Ohio.  After Wright rolled down his window, conversation ensued with a friend who stood outside the residence. The friend never came over to the SUV, and Wright never exited the vehicle.  Their visit lasted for about a minute.

Unbeknownst to Wright and his friend, plain-clothed Officers Kyle Flagg and Vashon Williams, in an unmarked vehicle, were surveilling the friend's home based on reports of illegal drug activity in the area and at that residence in particular.  The officers identified Wright's vehicle as a rented Ford Edge SUV.  Based on the short amount of time Wright spent at the house, the officers suspected that he may have been involved in a drug transaction.

After Wright pulled out of the driveway, Flagg and Williams followed him.  He turned right onto Recher Avenue and then left onto East 212th Street.  The officers maintain that at both turns, Wright failed to use his turn signal, but there is no dash-cam footage or other evidence to confirm the officers' word.  Wright insists that he did use his turn signal in both instances.

The situation escalated after Wright pulled into a second driveway to answer a text message from his girlfriend.  While Wright texted in the SUV, the officers exited their vehicle, drawing their guns as they approached the SUV.  One of the men caught Wright's eye when he glanced up from his texting.  In his side mirror, Wright could see this man dressed in dark clothing with a gun pointed at the SUV.  Believing that he was about to be robbed, Wright dropped his cellphone in the center console and threw the car into reverse.  Glancing to his left, he saw another armed man, but this time he noticed a badge.  Wright heard the men yell: "Shut the car off!" and "Open the door!"  Now realizing that the men were police officers, he put the

car in park and put his hands up.  These events are corroborated by the body-cam footage. At this point, Flagg stood beside the driver's side door while Williams was next to the front passenger door.  Both officers holstered their guns.

Next, Flagg yanked the driver's side door open and demanded that Wright shut off the vehicle.  Wright complied and then raised his hands once more.  Flagg grabbed Wright's left wrist, twisting his arm behind his back.  The officer  then attempted to gain control of Wright's right arm in order to handcuff him behind his back while he remained seated in the vehicle. Flagg was unsuccessful in his efforts.  As Flagg continued to twist the left arm, Wright repeatedly exclaimed that the officer was hurting him, to which Flagg responded, "let me see your hand," apparently referring to Wright's right hand.

Flagg then tried to pull Wright from the vehicle, but the latter had difficulty getting out. As noted, Wright had recently undergone surgery for diverticulitis, which required staples in his stomach and a colostomy bag attached to his abdomen.  Though the officers apparently could not see the bag and staples, these items prevented Wright from easily moving from his seat.  Wright placed his right hand on the center console of the car to better situate his torso to exit the car.  By this point Williams had moved over to stand behind Flagg on the driver's side. Williams responded to Wright's hand movement by reaching around Flagg to pepper-spray Wright at point-blank range.  Flagg simultaneously deployed his taser into Wright's abdomen.  The besieged detainee finally managed to exit the car with his hands up.  He then was forced face down on the ground, where he explained to officers that he had a "shit bag" on. Officer Williams next handcuffed Wright while he was on the ground.

Wright was bleeding from the staples that attached the colostomy bag to his abdomen. The bag was now visible to Williams, who would testify that he "was kind of leery of getting some sort of biohazard on [him]."  R. 24 at PageID 938.  The officers had Wright sit on the trunk of his car while they called an ambulance.  As the body cam continued to record, Flagg made various arguably self-serving statements, including that "[Wright] was reaching like he had a f***ing gun," and that Flagg had been afraid that Wright was going to shoot him.  Wright did not have a gun, nor did he have any drugs or other contraband.  The officers conceded that they did not have probable cause to arrest Wright until *after* they believed he was resisting, and that they

had not seen Wright engage in any illegal activity prior to the arrest apart from his alleged failures to use his turn signal. They arrested Wright for the misdemeanors of obstructing official business and resisting arrest.

After Wright's arrest, a hospital doctor treated him for bleeding in his abdomen because of the stress placed on the staples around his colostomy bag. Wright refused to submit to an x-ray because of his recent surgery. The officers responded by demanding a CT scan of Wright's abdomen, but the doctors refused to perform the scan after consulting with the hospital's legal department. Wright was then discharged from the hospital and taken to the Euclid jail.

At his 10:45 p.m. booking, Wright was charged with the two misdemeanors for which he was arrested (obstructing official business and resisting arrest), along with two other offenses (criminal trespass and failure to use a turn signal). Despite the fact that Wright had no drugs when he was arrested and was not charged with any drug-related offenses, the officers designated Wright's arrest as stemming from a drug investigation. Flagg acknowledged that he knew that this designation would result in Wright's being subjected to additional, more thorough searches.

Wright posted bond between 11:00 p.m. and midnight, but he still was not released from police custody. As Wright was attempting to leave the Euclid jail, a corrections officer told him that he would be taken to the Cuyahoga County jail for a full body scan to see if he was hiding drugs in his abdomen. Shortly after 1:00 a.m., he arrived at this next facility, where jail staff searched him using a body scanner. The search turned up nothing. Wright finally was released from custody at 3:55 a.m.

Over seven months later, all the charges against Wright were dropped. Neither Flagg nor Williams was investigated or disciplined for his encounter with Wright, and their use of force was approved by their supervisors.

**B.    The City of Euclid's Practices and Customs**

Wright argues that his injury is directly attributable to the City's policy or custom of indifference to use of force. Euclid police officers undergo "defensive tactics training" that

purportedly trains officers in methods to defend themselves or defuse a situation. Flagg maintains he used "defensive tactics" in subduing Wright.

This training contains a link to a YouTube video of a Chris Rock comedy skit entitled "How not to get your ass kicked by the police!" The video shows numerous clips of multiple police officers beating African-American suspects. During the video, Rock says things such as:

> "People in the black community . . . often wonder that we might be a victim of police brutality, so as a public service the Chris Rock Show proudly presents: this educational video."

> "Have you ever been face-to-face with a police officer and wondered: is he about to kick my ass? Well wonder no more. If you follow these easy tips, you'll be fine."

> "We all know what happened to Rodney King, but Rodney wouldn't have got his ass kicked if he had just followed this simple tip. When you see flashing police lights in your mirror, stop immediately. Everybody knows, if the police have to come and get you, they're bringing an ass kicking with 'em."

> "If you have to give a friend a ride, get a white friend. A white friend can be the difference between a ticket and a bullet in the ass."

InsaneNutter, *Chris Rock-How not to get your ass kicked by the police!* (Feb. 2, 2007), https://www.youtube.com/watch?v=uj0mtxXEGE8 [https://perma.cc/NU2W-MGLN].

Sergeant Murowsky conducts the use-of-force trainings and reviews all incidents of officer-involved force. He stated that he thought the video was humorous and that it related to things that Euclid police officers have experienced. The City's use-of-force training also includes a PowerPoint presentation, the first page of which displays a stick figure cartoon portraying a police officer in riot gear beating a prone and unarmed civilian with a club with the caption "protecting and serving the poop out of you." R. 23 at PageID 808.



Sergeant Murowsky testified that he did not believe that the graphic conveys that the Euclid Police Department "beat[s] the hell out of people," R. 25 at PageID 1200, but he didn't know what other message could possibly be taken away from the image.

Finally, the use-of-force training contains a meme that depicts two officers with their guns drawn and aimed at something. It is captioned "Bed bug! Bed bug on my shoe!" Sergeant Murowsky testified that he believed the image conveyed that the officers were overreacting to and escalating a situation.

When the Euclid Police Department receives allegations of excessive force, Sergeant Murowsky reviews the relevant incident report to determine whether the use of force was appropriate. Murowsky approved the use of force against Wright, as he had done numerous times with respect to other incident reports. In fact, he testified that he had never heard of a use-of-force incident by another Euclid officer that he deemed inappropriate. Likewise, Chief Meyer testified that he had never found merit to any civilian complaint concerning use of force, false arrest, or illegal searches.

**C.    Proceedings Below**

Wright brought suit in the U.S. District Court for the Northern District of Ohio against the City of Euclid and Officers Flagg and Williams, alleging counts under 42 U.S.C. § 1983 of excessive force, false arrest, malicious prosecution, failure to intervene, extended detention, and the City's municipal liability, along with claims under Ohio law for malicious prosecution and intentional infliction of emotional distress.  After the close of discovery, the district court granted summary judgment to the officers and the City.  *Wright v. City of Euclid*, No. 1:17 CV 2503, 2019 WL 2009453, at \*12 (N.D. Ohio May 7, 2019).  Wright filed a timely appeal.

**II.**

We review a district court's grant of summary judgment de novo.  *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019) (internal quotations omitted).  Summary judgment is appropriate when "no genuine dispute as to any material fact" exists and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  At the summary judgment stage, "the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party."  *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (citing *Hawkis v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008)).

Wright raises several arguments on appeal.  First, he argues that the district court erred in granting summary judgment on qualified immunity grounds to Flagg and Williams for his excessive-force and failure-to-intervene claims based on brandishing their firearms and using a taser and pepper spray when he was not actively resisting arrest.  Second, he argues that the district court erred in granting the officers qualified immunity on his false-arrest and extended-detention claims.  Third, he claims that the district court erred in granting qualified immunity to the officers on his federal malicious-prosecution claim.  Fourth, he argues that the district court erred in holding that the officers were entitled to statutory immunity for his state-law claims.  Fifth, he argues that the district court erred in granting the officers summary judgment on his

state-law claims of malicious prosecution and intentional infliction of emotional distress. Sixth, and finally, he argues that the district court erred in granting summary judgment to the City of Euclid under *Monell*.

Most of Wright's arguments hinge on whether Flagg and Williams are immune from suit through qualified immunity or statutory immunity under Ohio law. We analyze whether an officer is entitled to qualified immunity using two steps: (1) whether the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Fazica v. Jordan*, 926 F.3d 283, 289 (6th Cir. 2019). A similar inquiry applies to statutory immunity under Ohio law. *See Hopper v. Phil Plummer*, 887 F.3d 744, 759 (6th Cir. 2018).

## A.    Excessive Force

Wright first argues that the district court erred in granting qualified immunity to Flagg and Williams on his excessive-force claims. He maintains that the officers used excessive force in brandishing their firearms as they approached his vehicle, that Flagg used excessive force in deploying his taser, and that Williams used excessive force in using pepper spray, all while (Wright claims) he was not resisting arrest.

"When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately." *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam). And when, as here, a plaintiff claims that excessive force was used multiple times, "the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way." *Id.*

### 1.    Officer Flagg

#### a.    Constitutional Violation

Wright argues that Flagg "used far more force than necessary to effect an arrest," Appellant's Br. at 42, when he approached Wright's SUV with his gun drawn and later deployed his taser on Wright while the latter sat in the driver's seat of the vehicle. When making an arrest or investigatory stop, the police have "the right to use some degree of physical coercion or threat

thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In determining whether the use of force in effecting an arrest is excessive in violation of the Fourth Amendment, we must determine "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. This inquiry assesses "reasonableness at the moment" of the use of force, as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quoting *Graham*, 490 U.S. at 396).

The bottom-line inquiry is "whether the totality of the circumstances justifies a particular level of force." *Coffey v. Carroll*, 933 F.3d 577, 588 (6th Cir. 2019) (citing *Mitchell v. Schlabach*, 864 F.3d 416, 421 (6th Cir. 2017)). Three factors from *Graham* guide this analysis: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006) (quoting *Graham*, 490 U.S. at 396). Balancing these factors, and viewing the record in the light most favorable to Wright, a reasonable juror could conclude that Flagg used excessive force both when he brandished his firearm and when he deployed his taser.

As to the firearm, we have held that a police officer may approach a suspect with a weapon drawn during a *Terry* stop when the officer reasonably fears for his safety. *United States v. Hardnett*, 804 F.2d 353, 357 (6th Cir. 1986); *see also United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) ("[When the] surrounding circumstances give rise to a justifiable fear for personal safety, a seizure effectuated with weapons drawn may properly be considered an investigative stop." (alteration in original) (quoting *Hardnett*, 804 F.2d at 357)). Moreover, we have held that when a suspect is reasonably suspected of carrying drugs, an officer is "entitled to rely on [his] experience and training in concluding that weapons are frequently used in drug transactions." *Heath*, 259 F.3d at 530. In *Heath*, the officers surveilled the defendant four times over the course of a month and observed conduct that they believed was consistent with drug activity, including stopping at locations under investigation for drug activity, checking for tails, and associating with "a large-scale drug trafficker." *Id.* at 525. The police had identified the

defendant and knew that he had three misdemeanor convictions and one felony drug conviction. *Id.* at 524. They also obtained information from a confidential informant that the defendant was trafficking in large quantities of cocaine. *Id.* In those circumstances, we held that it was reasonable for the officers to approach the defendant's vehicle with their guns drawn when conducting a *Terry* stop after seeing him leave a building with a known large-scale drug trafficker while carrying a bag. *Id.* at 530.

Relying on *Heath*'s "drug activity = guns" premise, the district court in this case held as a matter of law that Flagg and Williams were justified in drawing their weapons for protection upon approaching Wright's vehicle. *See* Appellant's Br. at 44; *see also Wright*, 2019 WL 2009453, at *6 ("Thus, the officers in this case, having an objective reason to believe that Mr. Wright may have been involved in drug activity, also had a reasonable belief that he may be in possession of a weapon."). The facts in this case, however, can be distinguished from *Heath*. Unlike the defendant officers in *Heath*, the officers here had very little, if any, reason to think that the detainee was involved in drug activity. Flagg and Williams had observed Wright pull into a driveway at his friend's house and speak to his friend for about one minute to exchange greetings. According to Wright, he did not pull all the way up the driveway. While conversing, Wright stayed in his car and the friend stayed on the porch. According to the officers, they were surveilling the residence "based upon multiple arrests and complaints regarding drug activity." However, according to Wright, the prior complaints for the residence were all stale, only three of the six complaints pertained to drugs, and none of the complaints pertained to him. Flagg and Williams also admit that they did not see Wright engage in any criminal activity, drug-related or otherwise, while stopped at the residence.

Nevertheless, based only on Wright's brief stop at the residence, the officers decided to conduct a traffic stop with weapons drawn. These circumstances are very different from those in *Heath* where the officers had a justifiable fear for their safety given that the defendant, whom they had identified and surveilled for a month, was a large-scale drug dealer and likely to be carrying a weapon. Flagg and Williams at most had a suspicion that Wright had briefly visited with a suspected drug dealer, but given that the officers had not identified Wright himself as a drug dealer or sought any corroboration of their suspicions of criminal activity, there is a genuine

dispute as to whether the officers were justified in brandishing their firearms upon approach. Thus, a jury must determine whether their decision to do so was unconstitutionally excessive. *See, e.g.*, *Croom v. Balkwill*, 645 F.3d 1240, 1252 n.17 (11th Cir. 2011) ("An officer's decision to point a gun at an unarmed civilian who objectively poses no threat to the officer or the public can certainly sustain a claim of excessive force." (collecting cases)).

Second, as to Flagg's use of his taser, we hold that this too must be submitted to a jury to determine whether the use of force was excessive. The tasering occurred when Flagg had, at most, reasonable suspicion—not probable cause—to detain him for the officers' drug investigation. *See Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (noting that "the fact that a plaintiff in a § 1983 suit had committed no crime clearly weighed against a finding of reasonableness"). Therefore, at no point *before* Flagg began to seize Wright did Flagg have probable cause to arrest him. The first *Graham* factor, relating to the severity of the suspected crime, thus cuts against a finding of justified use of force because there was no probable cause that he had committed any crime at all before the tasering occurred.

"Of course, the use of force can be reasonable, even when the crime at issue is innocuous. To determine whether this is so, we turn to the [second and third] *Graham* factors." *Thomas v. Plummer*, 489 F. App'x 116, 126 (6th Cir. 2012). Construing the record in the light most favorable to Wright, the second *Graham* factor—the immediate safety threat posed by the suspect to police and others—weighs in his favor as well. When Flagg deployed his taser, Wright was doing his best to comply with the officers' commands despite his recent surgery and difficulty in exiting the SUV. After Flagg and Williams had holstered their weapons, Flagg opened the driver's side door and Wright put his hands up. Flagg then demanded Wright turn off the engine, an order with which Wright complied, followed immediately by putting his hands up again. When Wright was unable to comply with Flagg's commands because of his stomach staples and colostomy bag, the encounter turned violent. Wright was not armed. According to Flagg, he thought Wright was reaching for a weapon in the center console and considered that movement to be an act of resisting arrest. Wright, however, disputes that his hand movement was threatening to the extent that he moved his hand at all. Although these two versions of events are not inconsistent with each other—that is, Flagg could have reasonably believed

Wright was reaching for a gun when in reality he was trying to comply with orders—a reasonable jury could find, based on the totality of the circumstances, that a reasonable officer would not believe that Wright posed an immediate threat to their safety.

Finally, the third *Graham* factor, which hinges on whether Wright was "actively" or "passively" resisting arrest, weighs in his favor as well when the facts are construed in his favor. *See Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) (noting that while active resistance to an officer's command can justify use of a taser, passive resistance—or no resistance at all—does not justify such use of force) (citing *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012)). Flagg maintains that when he opened the driver's side door, he grabbed Wright's left wrist and began to bring his left arm under control. Flagg claims that when Wright pushed down on the center console, Flagg lost control of Wright's arm, which Flagg described as an act of resistance. A reasonable juror, however, could accept Wright's account that he was not resisting, but rather was simply having difficulty maneuvering while seated in the vehicle and in Officer Flagg's forced hold.

Even if Flagg is correct that Wright's act of pushing down on the center console constituted some resistance, if the resistance was merely "passive," then the use of a taser was unreasonable. *See Goodwin*, 781 F.3d at 323. The tasering of Wright was justified only if he engaged in resistance that was "active," which "can take the form of 'verbal hostility' or a 'deliberate act of defiance.'" *Id.* at 323 (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534–35 (6th Cir. 2013)).

We recognized this principle in *Smith v. City of Troy*, where the plaintiff was tased while experiencing an epileptic seizure. 874 F.3d at 942. In that case, when officers arrived at the scene, the plaintiff was standing outside his car clinging to a fence, which led the officers mistakenly to believe that he had been driving under the influence. *Id.* In an attempt to return the plaintiff to his car, an officer tried to pry the plaintiff's fingers from the fence. *Id.* The plaintiff responded by pulling his arm away from the officer, at which point the officer forced the plaintiff to the ground and wrestled with him until a second officer arrived and deployed his taser. *Id.* The district court granted the officers qualified immunity, holding that "the officers used measured force in response to [the plaintiff's] defiance of their orders and reaching where

the officers could not see his hands." *Id*. at 943. We reversed, holding that "[a] reasonable juror could conclude that, in pulling his arm away, [the plaintiff's] resistance was minimal and that [the force used] was excessive." *Id*. at 945.

Similarly, the facts regarding Wright's arm movement would allow a reasonable juror to find that his resistance was minimal to the extent that it constituted resistance at all. Wright maintains that he reached down towards the center console in order to assist the officers in removing him from the SUV because his mobility was limited as a result of his surgery, colostomy bag, and staples in his stomach. However, Flagg claims that he was not aware of Wright's medical problems until after he had deployed his taser. The reasonableness of force is predicated solely on the knowledge of officers in the moments before the force is used. *Graham*, 490 U.S. at 396–97. Therefore, if the officers did not know of Wright's recent surgery, the colostomy bag or the stomach staples, those facts would bear no weight in the reasonableness calculus. But, even if the officers had no knowledge of any of these facts, there are other facts that, when construed in Wright's favor, could support a reasonable juror's finding that Wright did not actively resist. In a split-second reaction, Wright pushed down on the center console in an attempt to maneuver his torso into a better position to get out of the car. Construing the record in the light most favorable to Wright, his act of purported resistance is close enough to that of the plaintiff in *Smith* to present a question of fact for a jury to decide whether Wright in fact actively resisted arrest.

That this issue presents a jury question is confirmed by our consideration of the officer's actions "in light of testimony regarding the training that [the officer] received." *Griffith v. Coburn*, 473 F.3d 650, 657 (6th Cir. 2007). Wright presented expert testimony from Roy Taylor, a police officer and expert on police-involved use of force, who testified that the level of force used was unreasonable. In his affidavit, Taylor noted that the Model Policy on Electronic Control Weapons of the International Association of Chiefs of Police (of which the Euclid police chief is a member), the TASER training manual, and the Euclid Police Department's use-of-force continuum, each outline circumstances in which use of a taser is appropriate. According to Taylor, "[n]one of the circumstances . . . were present when Officer Flagg deployed his taser

against Lamar Wright.  Officer Flagg used a greater level of force than other officers would have used if facing the same, or similar circumstances."  R. 31-6 at PageID 1415.

Finally, and significantly, at no point before Flagg deployed his taser was Wright under arrest for any offense.  As we noted in *Smith*, "the mere failure of a citizen—not arrested for any crime—to follow the officer's commands does not give a law enforcement official authority to put the citizen in handcuffs."  874 F.3d at 945.  By the same logic, an officer may not tase a citizen not under arrest merely for failure to follow the officer's orders when the officer has no reasonable fear for his or her safety.  Whether the tasering in this instance was constitutionally permissible must be decided by the jury, given the genuine factual disputes described above concerning the circumstances of Wright's encounter with the officers.

### b.      Clearly Established Right

We now must decide whether, accepting Wright's version of the facts, Flagg's drawing of his weapon and use of the taser violated a constitutional right that was "clearly established at the time of the alleged violation."  *Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012).  For this prong of the qualified immunity analysis, we are "not to define clearly established law at a high level of generality."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

The district court held that it was "unaware of any controlling cases that have established a constitutional violation occurred when non-lethal force was used to obtain control over the suspect who reasonably appeared to pose a safety risk to officers."  *Wright*, 2019 WL 2009453, at *7.  In so holding, the district court examined the issue of whether the law was clearly established using too specific of a level of generality.  *See al-Kidd*, 563 U.S. at 742.  The district court also incorrectly framed the issue based upon Flagg's version of the facts by assuming that Wright did in fact "reasonably appear[] to pose a safety risk" to the officer.  Given that this was a summary judgment ruling, the district court instead should have considered whether the law was clearly established using Wright's version of the facts.  Wright contends that he had done nothing prior to his encounter with police to justify the officers' brandishing of their firearms. He also maintains that he had a right not to be tased when, during the course of an investigatory detention, he inadvertently broke away from the officer's grip, but presented no threat to others,

and did not actively resist arrest.  For the reasons discussed below, we hold that, viewing the facts in Wright's favor, Flagg's drawing of his firearm and use of his taser violated Wright's constitutional rights that were clearly established as of the date of the encounter, November 4, 2016.

We reach this conclusion by examining "whether the contours of" the plaintiff's constitutional rights "were sufficiently defined to give a reasonable officer fair warning that the conduct at issue was unconstitutional." *Brown v. Chapman*, 814 F.3d 447, 461 (6th Cir. 2016). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 482 U.S. 635, 640 (1987)).  "In determining whether a right was clearly established, we look first to decisions of the Supreme Court, then to our own precedents, and then to decisions of other courts of appeal, and we ask whether these precedents 'placed the . . . constitutional question beyond debate.'" *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013) (quoting *al-Kidd*, 563 U.S. at 741).

With respect to an officer's use of a firearm, we have recognized that "pointing a firearm at an individual and making a demand of that individual . . . communicates the implicit threat that if the individual does not comply with the . . . demands, the [one pointing the firearm] will shoot the individual." *Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019) (quoting *United States v. Bolden*, 479 F.3d 455, 461 (6th Cir. 2007)).  We have also recognized that pointing a gun at an individual can constitute excessive force under the Fourth Amendment.  *See Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).  We have addressed a similar scenario before.  In *Davis v. Bergeon*, 187 F.3d 635, 1999 WL 591448 (6th Cir. 1999) (table), we concluded that pointing or displaying a firearm could constitute excessive force in the following circumstances:

> [The detective] was not in the process of an arrest, but inspecting the ladies' restroom.  [The plaintiff] was attempting to enter the men's restroom to use the facilities and was not suspected of any wrongdoing at that point in time.  [The detective], dressed in plainclothes, allegedly did not identify herself, pointed her weapon at [the plaintiff] and ordered him to get on the floor.

*Id.* at \*5.  We concluded that those facts sufficed to allow a jury to find that the officer had violated the plaintiff's clearly established Fourth Amendment rights.  *Id.* at \*5–6;  *see also Saad v. City of Dearborn*, No. 10-12635, 2011 WL 3112517, at \*5 (E.D. Mich. July 26, 2011), *aff'd sub nom. Saad v. Krause*, 472 F. App'x 403 (6th Cir. 2012) (per curiam) (noting that that the Sixth Circuit has "held that pointing a gun at an unarmed suspect who is not fleeing or posing a risk to police officers may be an objectively unreasonable use of force" (citing *Binay*, 601 F.3d at 650)).  Based on this authority, it was clearly established as of the time of Wright's encounter with the officers that brandishing a firearm without a justifiable fear that Wright was fleeing or dangerous was unreasonable and constituted excessive force.

In conducting the analysis as it pertains to use of the taser, two lines of cases emerge. The first holds that there is no clearly established right not to be tased when a suspect is actively resisting arrest.  *See, e.g.*, *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509–10 (6th Cir. 2012) (noting that, as of 2007, a suspect who refused to be handcuffed and actively resisted arrest did not have a clearly established right not to be tased).  The second line of authority holds that there is a clearly established right not to be tased when the suspect is not actively resisting arrest.  *See Brown*, 814 F.3d at 462 (holding that "as of December 31, 2010, it was clearly established that tasering a non-threatening suspect who was not actively resisting arrest constituted excessive force"); *Coffey*, 933 F.3d at 589 ("Drawing the line at a suspect's active resistance defines the right at a level of particularity appropriate for a claim pursued under § 1983."); *Smith*, 874 F.3d at 945 ("It was well-established [in 2014] that a non-violent, non-resisting, or only passively resisting suspect who is not under arrest has a right to be free from an officer's use of force.").  Assuming Wright's version of the facts to be true, this case falls neatly within the second category of cases.

To summarize, a reasonable jury could find that Flagg's actions constituted unreasonable and constituted excessive force.  It was clearly established as of November 4, 2016 that drawing a weapon on a suspect who was not fleeing or posing a safety risk and tasering a suspect who was not actively resisting arrest constituted excessive force.  Therefore, we **REVERSE** the district court's grant of summary judgment on qualified immunity grounds to Flagg as to the excessive-force claims.

2.      **Officer Williams**

a.      **Violation of a Constitutional Right**

Wright's excessive-force claim against Williams, based on his brandishing of a firearm and use of the pepper spray, largely mirrors the claim against Flagg based on his similar use of a firearm and tasing, and therefore the analysis is largely the same. The discussion of the *Graham* factors as they relate to Williams is identical to the analysis of those factors as they concern Flagg. The severity of the crime, whether Wright was a threat to the police, and whether Wright actively resisted arrest all present questions of fact that should be decided by a jury.

In *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994), we held that summary judgment was inappropriate for an excessive-force claim brought against police officers for the use of pepper spray, when it remained genuinely disputed whether the plaintiff had committed a crime, whether he posed a threat, and whether he was resisting arrest. *Id.* at 385–86; *see also Vaughn v. City of Lebanon*, 18 F. App'x 252, 266–68 (6th Cir. 2001). Here, as discussed, it remains genuinely disputed whether Wright had committed a crime, whether he posed a threat to officers, and whether he was actively resisting arrest. *See, e.g.*, *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009) ("An officer has used excessive force when he pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest.").

The body-cam footage shows that while Flagg was attempting to gain control of Wright's right arm, Williams reached into the car with the can of pepper spray and sprayed Wright within inches of his face. Wright's expert opined that the use of pepper spray at this close distance was unreasonably dangerous and violated nationally-accepted standards and protocols, which dictate that pepper spray "should not be used on someone closer than three feet from the canister's nozzle." R. 31-6 at PageID 1416. Further, this expert noted that the Euclid Police Department's use-of-force continuum indicates that pepper spray should be used only when an individual is wrestling with or pushing an officer, not when the suspect is pulling away from an officer. This testimony supports Wright's argument that Williams acted unreasonably in his use of the pepper spray.

Furthermore, the evaluation of the reasonableness of officers' use of force "considers the *effects* of their actions, as any inquiry into a violation of the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Brown*, 814 F.3d at 459 (quoting *Graham*, 490 U.S. at 396). As Wright's expert opined, use of pepper spray at such a close proximity risks significant injury, which is not present if the officer uses the spray at a safe distance. This testimony and the other proof present a jury question as to whether Williams's use of the pepper spray constituted excessive force in violation of Wright's constitutional rights.

### b.      Clearly Established Right

For reasons similar to those discussed above as they relate to Flagg's use of his taser, we hold that the right to be free from being pepper sprayed when a suspect is not actively resisting arrest was also clearly established at the time of the encounter in question. *See, e.g.*, *Coffey*, 933 F.3d at 589 (6th Cir. 2019) ("Drawing the line at a suspect's active resistance defines the right at a level of particularity appropriate for a claim pursued under § 1983."); *Smith*, 874 F.3d at 945 ("It was well-established [in 2014] that a non-violent, non-resisting, or only passively resisting suspect who is not under arrest has a right to be free from an officer's use of force.").

Wright has produced evidence that would allow a reasonable juror to conclude that he had not committed a serious crime, or any crime at all; that he was not a danger to the officers or the public; and that he was not resisting arrest. Although the officers tell a different story, it should be up to the jury to determine whose story is more credible. Therefore, we **REVERSE** as to the excessive-force claim against Williams for deploying his pepper spray, as well as for brandishing his firearm.

## B.      Failure to Intervene

Wright further claims that both Flagg and Williams failed to intervene to protect him from alleged excessive force committed by the other. In order to establish such a claim, Wright must prove that "the officer observed or had reason to know that the excessive force would be or was being used and that the officer had both the opportunity and the means to prevent the harm

from occurring." *Smith*, 874 F.3d at 945–46 (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). Wright maintains that because the officers were "practically on top of each other" when they used the allegedly excessive force of the taser and pepper spray, Appellant's Br. at 49, each officer had the opportunity to prevent the other from using force. However, we are not persuaded that the evidence would allow a reasonable juror to find a constitutional violation as to either of these failure-to-intervene claims.

In *Smith*, we held that when one officer was "occupied trying to gain control of [the plaintiff's] arms while [the other officer] was deploying his taser," no reasonable juror could find that the officer had the opportunity and the means to prevent the excessive force. 874 F.3d at 946. So too here. Although Wright is correct that the officers were in close proximity to each other, the body-cam footage from both Flagg and Williams shows that when Williams used pepper spray on Wright, Flagg was struggling with Wright in an attempt to remove him from the car. Like the officer in *Smith*, at the time Williams used his pepper spray, Flagg was preoccupied with attempting to detain Wright. The body-cam footage shows Flagg grappling with Wright's arms when Williams reached into the car to deploy the pepper spray. This all happened within a span of approximately ten seconds. Therefore, similar to the court's holding in *Smith*, we hold that no reasonable juror could find that Flagg had the opportunity and means to prevent Williams from using pepper spray. *See id.*

Likewise, no reasonable juror could find a constitutional violation in Williams's failure to prevent Flagg's use of his taser. The body cam footage shows that Flagg tased Wright for approximately five seconds during which time Williams reached around Flagg to pepper spray Wright. The use of force happened almost simultaneously. Wright has failed to demonstrate "that the incident lasted long enough for [Williams] to both perceive what was going on" with Flagg's tasering "and intercede to stop it." *Burgess*, 735 F.3d at 475.

Therefore, we **AFFIRM** the district court's grant of summary judgment to Flagg and Williams with respect to the failure-to-intervene claims.

**C.     Fourth Amendment False Arrest**

Wright also maintains that the district court erred in granting summary judgment to the officers on his Fourth Amendment false-arrest claim. For Wright to succeed on this claim, he must prove that the police lacked probable cause to arrest him. *Burley v. Gagacki*, 834 F.3d 606, 613–14 (6th Cir. 2016). "An officer possesses probable cause when, at the moment the officer seeks the arrest, 'the facts and circumstances within the officer's knowledge and of which [he] had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the plaintiff had committed or was committing an offense.'" *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (alterations omitted) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "If probable cause exists to arrest the suspect for any of the charged offenses, then the false arrest claim must fail." *Fineout v. Kostanko*, 780 F. App'x 317, 328 (6th Cir. 2019) (citing *Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2005)).

Wright was charged for failure to use his turn signal, resisting arrest, obstructing official business, and criminal trespass. However, for purposes of summary judgment, the officers maintain that their bases for probable cause to arrest were Wright's resisting arrest and his obstruction of official business. We therefore address below whether probable cause existed for the arrest based on these latter charges only.

**1.     Obstructing Official Business**

The officers contend that they arrested Wright, in part, "because he was … obstruct[ing] official business." Appellees' Br. at 40. Under Ohio law, one is guilty of obstructing official business if he, "without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." Ohio Rev. Code § 2921.31. With respect to the element of "purpose to obstruct," "[a] person acts purposely when it is his specific intention to cause a certain result." *City of N. Ridgeville v. Reichbaum*, 677 N.E.2d 1245, 1249 (Ohio 1996) (quoting Ohio Rev. Code § 2901.22(A)). The statute also requires an affirmative act that interrupts police business; "[a] person may not be convicted of the offense simply by doing nothing." *Lyons*,

415 F.3d at 573 (citing *State v. McCrone*, 580 N.E.2d 468, 470–71 (Ohio 1989)). The act must actually hamper or impede the officer in the performance of his duties, and "there must be some substantial stoppage of the officer's progress." *State v. Wellman*, 879 N.E.2d 215, 219 (Ohio 2007) (quoting *State v. Stephens*, 387 N.E.2d 252, 253 (Ohio 1978)).

On several occasions we have examined the Ohio statute that prohibits obstruction of official business. The affirmative-act requirement requires more than a failure to comply with an officer's request. *See Jones v. City of Elyria*, 947 F.3d 905, 915 (6th Cir. 2020) (citing *Patrizi v. Huff*, 690 F.3d 459, 464 (6th Cir. 2012)). Also, when a suspect pulls her hand away from the police but otherwise complies with orders, she has not engaged in an affirmative act giving officers probable cause to arrest for obstruction of official business. *Smith v. City of Wyoming*, 821 F.3d 697, 716 (6th Cir. 2016). Based on this standard, a reasonable juror could find that Wright's actions did not involve any affirmative act that obstructed police business. Wright maintains that he was doing his best to comply, and the act of moving his arm was really an attempt to maneuver his torso in the car so as to allow Flagg to remove him from the car— despite the fact that the seizure was unlawful.

Certainly, Wright's and the officers' respective versions of events are not necessarily inconsistent. Wright could have earnestly believed that he was trying to help Flagg remove him from the car, and Flagg could have simultaneously believed that Wright was trying to interfere with his arrest. But viewing the facts in the light most favorable to Wright, a reasonable jury could find that he did not engage in an affirmative act such as to give rise to probable cause that he was obstructing official business.

### 2. Resisting Arrest

In his deposition, Flagg conceded that he did not have probable cause to arrest Wright until he started "resisting." This puts the cart before the horse. When an underlying arrest is for resisting arrest and nothing more, "the officers could not, as a matter of law, have probable cause to arrest [Wright] where the underlying arrest was not lawful." *Osberry v. Slusher*, 750 F. App'x 385, 395 (6th Cir. 2018); *see* Ohio Rev. Code § 2921.33(A) ("No person, recklessly or by force, shall resist or interfere with a *lawful* arrest . . . .") (emphasis added); *see also Hoover v. Garfield*

*Heights Mun. Court*, 802 F.2d 168, 174 (6th Cir. 1986) ("[W]e conclude that [Ohio Rev. Code] § 2921.33 indeed forbids only resisting a lawful arrest and does not prohibit resisting an unlawful arrest."). Because a reasonable jury could find that Flagg and Williams did not have probable cause to arrest Wright prior to his alleged resistance, they are not entitled to summary judgment that the arrest was justified. *See Osberry*, 750 F. App'x at 395.

* * * * *

If the jury finds that the officers lacked probable cause that Wright had engaged in any illegal activity, then it would be clearly established that the officers falsely arrested him, in violation of his Fourth Amendment rights. Indeed, the right to be free from arrest without probable cause is a "quintessential example[] of [a] 'clearly established' constitutional right." *Jones*, 947 F.3d at 915. Wright has presented sufficient evidence for a reasonable jury to find no probable cause—and no qualified immunity—for the arrest.

Therefore we **REVERSE** the district court's grant of summary judgment to Flagg and Williams on the false-arrest claim.

## D.    Extended Detention

Wright also brought a claim for a violation of the Fourth Amendment based on his extended detention after he posted bond. This claim is, in essence, derivative of his false-arrest claim—that is, his detention was unreasonably extended without probable cause. The Fourth Amendment "establishes the minimum constitutional 'standards and procedures' not just for arrest but also the ensuing 'detention.'" *Manuel v. City of Joliet*, 137 S. Ct. 911, 917 (2017) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).

### 1.    Constitutional Violation

Before being taken into custody, Wright was hospitalized for his injuries from his encounter with Flagg and Williams. Both officers stayed in the hospital with Wright for approximately four hours. Wright alleges that, during that time, the officers sought a CT scan of Wright because they thought he was hiding drugs in his abdomen. At one point, hospital staff took Wright to get an X-ray, but he refused to consent because of radiation concerns. According

to Wright, his refusal to be X-rayed infuriated Flagg and Williams, along with other unnamed officers who were present at the hospital. The officers were so angry, according to Wright, that they told him they were going to charge him because he would not be X-rayed.

Upon discharge from the hospital, Wright was indeed arrested and taken to the Euclid City Jail. Wright was booked at this facility at 10:49 p.m. His cousin arrived and posted bond for Wright sometime between 11:00 p.m. and midnight. However, Wright was not then released. Instead, after Wright posted bond, an officer told him that he had to be taken downtown to undergo a body scan to see if he was hiding drugs in his body.

At approximately 1:00 a.m., Wright was transferred from the Euclid City Jail to the downtown Cuyahoga County Jail. When he arrived at this next facility, the staff asked him if he had ingested any drugs or was hiding any drugs in his body. The jail staff informed him that his bond had been paid, and he would be released once they had performed a body scan. County jail staff then subjected Wright to a full-body scan. The scan revealed that Wright was not sequestering any drugs. Wright was finally released from custody at 3:55 a.m., approximately four hours after he posted bond, and almost ten hours after Flagg and Williams detained him.

Under Ohio law, when a defendant posts bail bond, he should be released from custody. *See* Ohio Rev. Code § 2713.13 ("The bond, when accepted, shall be returned to the clerk's office, and the defendant shall be discharged."). The approximate four-hour delay in his release was caused by the designation of his arrest as drug-related. At the time the drug designation occurred, both Wright and his SUV had been searched, and no drugs or other contraband had been found. Nor were drugs or other contraband found on him when he was searched (again) by officials at the jail. He was never charged with any drug-related offense.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. As the text indicates, and the Supreme Court has repeatedly affirmed, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Riley v. California*, 573 U.S. 373, 381)). Nothing happened from the time that Wright was detained in his SUV to the time he posted bond to give officers probable cause to believe that

Wright was hiding drugs in his body.  Despite the officers' having no information that would give them probable cause, Wright was seized for four hours after he should have been free to go. A jury could find that this detention violated Wright's right to be free from unreasonable seizures.

### 2.    Clearly Established Right

Because the extended-detention claim, in essence, is derivative of Wright's false-arrest claim, the law was likewise clearly established that officers could not seize him without probable cause.  As we stated above, the right to be free from arrest without probable cause is a "quintessential example[] of [a] 'clearly established' constitutional right."  *Jones*, 947 F.3d at 915.  Wright has presented sufficient evidence for a reasonable jury to find no probable cause— and no qualified immunity—for the extended detention.  Therefore, we **REVERSE** the district court's grant of summary judgment on Wright's extended-detention claim.

### E.    Fourth-Amendment Malicious Prosecution

Wright next argues that the district court erred in granting summary judgment on his claim of malicious prosecution in violation of the Fourth Amendment.  The Sixth Circuit "recognizes a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment, which encompasses wrongful investigation, prosecution, conviction, and incarceration."  *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (cleaned up) (quoting *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006)).

To succeed on this claim, Wright must prove four things: (1) that a criminal prosecution was initiated against him and that the defendant "made, influenced, or participated in the decision to prosecute," *id*. (alterations omitted) (quoting *Fox v. Desoto*, 489 F.3d 227, 237 (6th Cir. 2007)); (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, he suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding was resolved in his favor, *id*. at 308–09; *see also Fox*, 489 F.3d at 237.

**1.       The Officer Influenced or Participated in the Decision to Prosecute**

At minimum, "whether an officer influenced or participated in the decision to prosecute hinges on the degree of the officer's involvement and the nature of the officer's actions." *Sykes*, 625 F.3d at 311 n. 9; *see Malley v. Briggs*, 475 U.S. 335, 344–45 n. 7 (1986) (internal quotation omitted) (construing § 1983 "against the background of tort liability," in which people are responsible for the "natural consequences" of their acts).

Although Wright need not show that the officers influenced or participated with malice, "there must be some element of blameworthiness or culpability in the participation," that is, "truthful participation in the prosecution is not actionable." *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015) (citing *Sykes*, 625 F.3d at 314). The most clear-cut way for a plaintiff to satisfy this prong is to show that the officer gave false testimony before a grand jury. *See Webb v. United States*, 789 F.3d 647, 663 (6th Cir. 2015). But an officer can also influence or participate in the  decision to prosecute by falsely prompting or urging a prosecutor's decision to bring charges in the first place. *See id.* at 666.

Wright maintains that because Flagg conceded in his deposition that "by signing the tickets he initiated prosecution against Lamar Wright," the first prong of his malicious prosecution claim is met. The "tickets," or "traffic citations" as Flagg called them, were the official citations that appear to have been filed in Euclid Municipal Court that charged Wright with traffic violations, resisting arrest, obstructing official business, and criminal trespass. The district court noted that Wright "makes general allegations that the officers fabricated evidence, but points to no evidence of fabrication or falsification." *Wright*, 2019 WL 2009453, at *9. However, because the officers designated Wright's arrest to be the result of a drug investigation, despite knowing that Wright had no drugs when he was arrested and he was not arrested for any drug-related offenses, a reasonable juror could find that Flagg and Williams engaged in misrepresentation such that they were culpable in their involvement with Wright's prosecution. *Cf. Jones*, 947 F.3d at 918–19 (holding that filing a narrative report that falsely accuses a defendant of resisting arrest establishes sufficient culpability for a federal malicious prosecution claim).

At the time of the designation, the officers knew two things of which they were unaware when they pulled Wright over. First, they knew that Wright had a serious medical condition that prevented him from exiting the vehicle. Second, they knew that Wright was not possessing any drugs when they arrested him. These facts are sufficient for a reasonable juror to find the officers made a false statement that Wright's arrest was drug related, thereby establishing their requisite involvement in his prosecution for a claim that it was malicious.

**2.        Lack of Probable Cause for the Prosecution**

For the same reasons set forth above regarding Wright's false-arrest claim, a reasonable jury could likewise find that there was a lack of probable cause to prosecute Wright.

**3.        Deprivation of Liberty**

We have recognized that an "initial arrest alone is an insufficient deprivation of liberty" to support a claim for malicious prosecution. *Noonan v. Cty. of Oakland*, 683 F. App'x 455, 463 (6th Cir. 2017). Something more is required, and this circuit has held that "service with a summons to appear at trial or some other court proceeding does not rise to the level of a constitutional deprivation." *Id.* at 463 (internal quotation marks and citation omitted).

Wright argues that he suffered a deprivation of liberty beyond the initial seizure because he was confined in the jail and in the hospital for many hours after the initial seizure but before being released. That is enough to present a jury question under our caselaw. In *Miller v. Maddox*, the plaintiff had suffered a deprivation of liberty apart from the initial seizure when she remained detained for an extra forty-five minutes, paid a fee to be released, and was required to participate in a pretrial release program. 866 F.3d 386, 393 (6th Cir. 2017).

Here, Wright was booked into the Euclid jail at around 10:49 p.m., and he posted a $905.00 bond between 11:00 p.m. and midnight. After he posted bond, Wright was not allowed to leave. Rather, he was transported to the Cuyahoga County jail at around 1:00 a.m. He was then required to undergo a full body scan as a result of the "drug investigation" that was noted on his record. Wright was finally released at approximately 3:55 a.m. These facts would allow a reasonable jury to find that Wright suffered a deprivation of liberty beyond the initial seizure.

**4.      Criminal Proceeding Resolved in his Favor**

The district court did not explicitly address this element of the action, but it is obviously satisfied.  The prosecution was terminated in Wright's favor when the prosecutor dropped all charges against him.  *See Ash v. Ash*, 651 N.E.2d 945, 947–48 (Ohio 1995) ("[A]n unconditional, unilateral dismissal of criminal charges or an abandonment of a prosecution by the prosecutor or the complaining witness that results in the discharge of the accused generally constitutes a termination in favor of the accused.").

*      *      *      *      *

The right to be free from malicious prosecution is clearly established, but "the right is a narrow one."  *Coffey*, 933 F.3d at 590 (citing *Johnson*, 790 F.3d at 649).  "A police officer violates a suspect's clearly established right to freedom from malicious prosecution under the Fourth Amendment 'only when his deliberate or reckless falsehood results in arrest and prosecution without probable cause.'"  *Johnson*, 790 F.3d at 655 (quoting *Newman v. Twp. of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014)).  The officers' designation of Wright's arrest as drug-related, given their knowledge of the circumstances of his arrest, including his medical condition, is sufficient proof for a reasonable jury to find that the officers engaged in at least reckless falsehood that resulted in his wrongful detention and intrusive search.  Because Wright has produced enough evidence such that a jury could find in his favor on the federal malicious-prosecution claim, we **REVERSE** the district court's grant of qualified immunity on this count.

**F.      State-Law Claims**

In addition to his claims brought under § 1983, Wright brought state-law claims, including malicious prosecution and intentional infliction of emotional distress.  The district court held that the officers were entitled to immunity under the Ohio statute that grants immunity to municipal employees acting within the scope of their employment.  For the reasons that follow, we disagree with the district court.

### 1. State-Law Immunity

The district court granted summary judgment to the officers and the City on Wright's state-law claims based on Ohio statutory immunity. Ohio Revised Code Chapter 2744 grants immunity to political subdivisions and to employees of political subdivisions for actions arising within the course or scope of their employment. The City is immune from suit for damages unless one of several exceptions applies. Wright has not presented an argument as to why the City should be liable for his state-law claims, so this argument is forfeited. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995))).

As to Flagg and Williams, Ohio law grants immunity from civil suits to employees of political subdivisions unless:

(a) the employee's acts or omissions were manifestly outside the scope of their employment or official responsibilities;

(b) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or]

(c) civil liability is expressly imposed by a section of the Revised Code.

Ohio Rev. Code § 2744.03(A)(6)(a)–(c). Because the officers' conduct was within the scope of their employment and because civil liability is not expressly imposed by another section of the Ohio Revised Code, Wright must show that their acts were "with malicious purpose, in bad faith, or in a wanton or reckless manner." *Id*. § 2744.03(A)(6)(b).

"When federal qualified immunity and Ohio state-law immunity under [Ohio Rev. Code] § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense 'through the lens of federal qualified immunity analysis.'" *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009)). The officers' state-law statutory-immunity defense therefore "stands or falls with their federal qualified immunity defense." *Id*. at 760; *cf. Martin v. City of*

*Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013) (holding that "[a]s resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive force determination under § 1983, the district court properly denied summary judgment to the officers on the estate's state-law claims"). For the reasons discussed above regarding qualified immunity, we hold that the district court erred in granting statutory immunity to Flagg and Williams.

### 2.      State-Law Malicious Prosecution

To sustain an action for malicious prosecution under Ohio law, Wright must establish: (1) malice in instituting or continuing the prosecution; (2) lack of probable cause; and (3) termination of the prosecution in his favor. *Ash v. Ash*, 651 N.E.2d 945, 947 (Ohio 1995). Unlike Wright's federal malicious-prosecution claim, his Ohio state law claim requires a showing of malice. "Ohio law defines 'malice' as 'an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice.'" *Harris v. Bornhorst*, 513 F.3d 503, 521 (6th Cir. 2008) (quoting *Criss v. Springfield Twp.*, 564 N.E.2d 440, 443 (Ohio 1990)); *accord, e.g.*, *Harris v. United States*, 422 F.3d 322, 327 (6th Cir. 2005). Moreover, under Ohio law, the absence of probable cause to seize a person raises an inference of malice. *See, e.g.*, *Melanowski v. Judy*, 131 N.E. 360, 361 (Ohio 1921) ("If want of probable cause be proven, the legal inference may be drawn that the proceedings were actuated by malice."); *Criss*, 564 N.E.2d at 443 ("If the basis for prosecution cannot be shown, those who made the decision will appear to have acted with no basis—that is maliciously."); *accord, e.g.*, *Bornhorst*, 513 F.3d at 521; *Thacker v. City of Columbus*, 328 F.3d 244, 261 (6th Cir. 2003).

As explained above, Wright has demonstrated a genuine factual dispute as to whether Officers Flagg and Williams lacked probable cause to arrest him. He has also demonstrated a triable issue regarding whether Officers Flagg and Williams wrongfully, and perhaps even willfully, designated his arrest as stemming from a drug investigation in order to detain him, cause him to undergo a full body scan, and potentially justify their past actions. Under our case law, this constitutes an "improper purpose" sufficient to overcome Defendants' motion for summary judgment. *See, e.g.*, *Jones*, 947 F.3d at 921 (holding that "a reasonable jury could infer malice on behalf of all three officers" where "the jury could find that all three officers lied in

ways that were material to the eventual decision to prosecute Jones, for the purpose of justifying their own prior actions").

Therefore, we **REVERSE** the district court's grant of summary judgment on the state law malicious prosecution claim.

### 3.        **Intentional Infliction of Emotional Distress**

Though Wright dedicates some portion of his briefing to arguing that the district court erred in granting summary judgment to the officers on his intentional-infliction-of-emotional-distress claim, his argument is little more than a bare recitation of the elements of the cause of action, and for that reason is forfeited. *See United States v. Fowler*, 819 F.3d 298, 309 (6th Cir. 2016) ("It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones." (quoting *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009)). We therefore we **AFFIRM** the district court's grant of summary judgment on this claim.

## G.      **Municipal Liability under 42 U.S.C. § 1983**

We now reach Wright's *Monell* claim. Wright argues that the City is liable under § 1983 for its inadequate policy on use of force by police; ratification of use of excessive force by the chief of police; failure to adequately train or supervise its officers on use of force; and a custom of tolerance or inaction towards excessive force. The district court granted the City summary judgment on this claim for want of a constitutional violation.

The § 1983 cause of action may be exercised only against a "person who . . . causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Although "person" has been given a wide meaning under § 1983, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), when the person is a municipality, liability attaches only under a narrow set of circumstances. "A municipality may not be held liable under § 1983 on a *respondeat superior* theory—in other words, '*solely* because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691). Instead, a plaintiff must show that "through its deliberate conduct, the

municipality was the 'moving force' behind the injury alleged." *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). A plaintiff does this by showing that the municipality had a "policy or custom" that caused the violation of his rights. *Monell*, 436 U.S. at 694.

There are four methods of proving a municipality's illegal policy or custom: the plaintiff may prove "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (citing *Burgess*, 735 F.3d at 478). Wright argues that he can establish municipal liability under three of the four methods: (1) a custom of tolerance or acquiescence of federal rights violations; (2) inadequate training and supervision; and (3) ratification of illegal actions by an official with final decision-making authority.

### 1.      Illegal Official Policy

"[T]o satisfy the *Monell* requirements a plaintiff must identify the policy, connect the policy to the city itself, and show that the particular injury was incurred because of the execution of that policy." *Jackson*, 925 F.3d at 829 (internal quotation omitted). Wright argues that the Euclid Police Department has a custom of permitting or acquiescing to the use of excessive force, which directly caused his injury. "[A] city may be liable under *Monell* for a policy of permitting constitutional violations regardless of whether the policy is written." *Id.* at 830; *see Monell*, 436 U.S. at 691 ("Congress included customs and usages [in § 1983] . . . . Although not authorized by written law, such practices . . . could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970))). When proceeding under the first theory of *Monell* liability, Wright must show that there were "formal rules or understandings—often but not always committed to writing—that [were] intended to, and [did], establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986).

Wright points to the Euclid Police department training on use of force to support his argument that the City has a custom of allowing excessive force. First, there is the link in the training materials to the YouTube video of the Chris Rock comedy sketch discussed earlier. As noted, it is entitled "How not to get your ass kicked by the police!". It includes numerous vignettes depicting police officers beating African-American suspects, with commentary from Rock about Rodney King and other matters as also described earlier.

The evidence further includes, as also noted, a slide from the same training titled "Defensive Tactics Training." The slide includes a cartoon in which a stick figure police officer in riot gear is shown beating a prone and unarmed civilian with a club with the caption "protecting and serving the poop out of you." R. 23 at PageID 808. Again, as noted, Murowsky testified that he did not believe that the image conveys that the Euclid Police Department "beat[s] the hell out of people," R. 25 at PageID 1200, but that he didn't know what other message could possibly be taken away from the image.

Finally, the use-of-force training contains a meme that depicts two officers with their guns drawn and aimed at something. It is captioned "Bed bug! Bed bug on my shoe!". Murowsky testified that he believed the image conveyed that the officers were overreacting to and escalating a situation.

Wright has produced enough evidence such that a reasonable jury could find that the City's custom surrounding use of force is so settled so as to have the force of law and that it was the moving force behind violations of Wright's constitutional rights. We therefore **REVERSE** the district court's grant of summary judgment on the issue of municipal liability under § 1983.

### 2.     Failure to Train or Supervise

"When determining whether a municipality has adequately trained its employees, 'the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Jackson*, 925 F.3d at 834 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). A failure-to-supervise claim requires a showing of "prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on

notice that the training in this particular area was deficient and likely to cause injury." *Burgess*, 735 F.3d at 478.

It is undisputed that Euclid police officers received some form of training on the proper use of force, but a reasonable juror could find that this training is deficient. The Euclid Police Department's training policy and procedures mandate that "[t]he department will establish and maintain a training committee." However, no such training committee apparently has ever existed.

The City's training seems to consist initially of simply reading the use-of-force policy to the officers at rollcall until "it is believed that all the officers have heard it," R. 31-7 at PageID 1508, which is then followed up with a one-or-two-page quiz that may or may not be given to officers. The City also engages in some sort of practical training exercise in which officers are given scenarios in which they may use force. But according to Murowsky, who implemented these scenario-based trainings, the scenarios never changed, and the officers' performances were never evaluated. And recall that this training also included the graphic and comedy skit discussed above.[1]

A reasonable jury could find that the City's excessive-force training regimen and practices gave rise to a culture that encouraged, permitted, or acquiesced to the use of unconstitutional excessive force, and that, as a result, such force was used on Wright. Therefore, we **REVERSE** the district court's grant of summary judgment on Wright's *Monell* claim based on failure to train or supervise. *See Jackson*, 925 F.3d at 836–37 (holding that a single instance of unconstitutional conduct can give rise to a failure-to-train claim when the natural consequence of the municipality's training regimen is that officials will violate constitutional rights); *accord Canton*, 489 U.S. at 390 ("[I]t may happen that in the light of the duties assigned to specific officers or employees the need for more or different training is so obvious . . . that the

---

[1]Wright directs our attention to three other instances of police force by Euclid police officers to support the notion that the police department "has a track record of excessive force and ongoing failure to take seriously the need to properly . . . train officers on use of force." Appellant's Br. at 66. Those three instances of use of force, while certainly troubling in their own right, cannot establish that the Euclid Police Department had a track record of excessive force at the time of Wright's constitutional injury because they all occurred after the incident with Wright.

policymakers of the city can reasonably be said to have been deliberately indifferent to the need.").

### 3.      Ratification by Decision-Maker

Wright argues that Chief Meyer's failure to investigate numerous claims of excessive force amounts to ratification of unconstitutional acts by a final decision-maker.  A plaintiff can establish municipal liability by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct.  *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1247–48 (6th Cir. 1990).  Wright points us to Chief Meyer's lack of investigation and discipline in the other high-profile use-of-force cases involving Euclid police officers, but those instances occurred after Wright's encounter with Flagg and Williams and cannot show that Meyer's failure to investigate and punish the officers involved in those uses of force led in any way to Wright's injuries.  However, Murowsky testified that he had *never* heard of a use of force incident by a Euclid officer that seemed inappropriate to him.  That too moves the needle so that a reasonable jury could decide that use of excessive force is ratified by the department.  A reasonable jury could likewise find that Meyer and Murowsky's seeming failure to ever meaningfully investigate excessive force complaints rises to the level of a ratification of use of force by a policymaker.

### IV.

It is very troubling that the City of Euclid's law-enforcement training included jokes about Rodney King—who was tased and beaten in one of the most infamous police encounters in history—and a cartoon with a message that twists the mission of police. The offensive statements and depictions in the training contradict the ethical duty of law enforcement officer *"*to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality, and justice." *Law Enforcement Code of Ethics*, International Association of Chiefs of Police, https://www.theiacp.org/resources/law-enforcement-code-of-ethics.

There is enough evidence to present jury questions that preclude summary judgment on the *Monell* claims under 42 U.S.C. § 1983. Likewise, the evidence regarding Wright's encounter with the police present jury questions that preclude summary judgment on the excessive-force, false-arrest, extended-detention, and federal malicious-prosecution claims under § 1983 as well. Accordingly, for the reasons stated above, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** to the district court for further proceedings.