**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0612n.06

Case No. 20-3228

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Oct 27, 2020

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MARATHON PETROLEUM COMPANY, LP, MPC INVESTMENT, LLC, | ) ) ) | |
| Plaintiffs-Appellees, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| NOIL PETROLEUM CORPORATION, | ) ) | |
| Defendant-Appellant. | ) | |

BEFORE: SUTTON, THAPAR, and READLER, Circuit Judges.

THAPAR, Circuit Judge. When two companies put a deal in writing, we expect that writing to reflect their final agreement. Parties may offer all sorts of commitments during negotiations, but they have an obligation to sort out any inconsistencies between those negotiations and the proposed writing before signing on the dotted line. Even if they don't, the written terms will control—any earlier, conflicting statements will normally have no legal effect. That is the situation here.

I.

This case arises from a contract between two petroleum companies: Marathon and Noil. Marathon agreed to sell Noil 40,000 barrels of slurry oil (a thick, black byproduct of the oil refining process). The plan was for Marathon to ship the slurry from a Louisiana refinery on the banks of

the Mississippi River to a terminal about 45 miles away. Noil would then turn around and sell it to a third company, Althea, at a profit.

The slurry never got that far. Marathon sent two barges of slurry down the river. They arrived at the delivery terminal on time, but there was no space to unload the slurry. Neither party had arranged for an available storage tank. So the barges bobbed around on the Mississippi for a few days, until Noil made arrangements for a "barge swap": Noil sold the slurry (at a steep discount) to a new customer who could take the two barges of slurry and send two empty ones back to Marathon.

Noil lost its contract with Althea (along with the expected profit). Worse still, it got less from the new customer in the barge swap than it owed Marathon for the slurry.

Each party blamed the other for the storage-tank snafu. Noil refused to pay for the slurry, and Marathon sued for breach of contract. Noil counterclaimed for breach of contract, fraudulent misrepresentation, negligent misrepresentation, and tortious interference with a business expectancy.

Both parties moved for summary judgment. The district court granted summary judgment for Marathon on its breach-of-contract claim and against Noil on its counterclaims. Noil appealed.

II.

Each of the parties' various arguments hinge on the answer to one essential question: Who was supposed to store the slurry? They both agree that Ohio law governs the contract, but that is where the consensus ends.

The contract contains a delivery term that allocates the storage-space responsibility to Noil. That term—"FOB BUYER FACILITY"—has a definite legal meaning. *See* Ohio Rev. Code § 1302.32(A) ("Unless otherwise agreed the term F.O.B. (which means 'free on board') at a named

place . . . is a delivery term . . . .”). An F.O.B. term allocates shipment and delivery obligations to the parties; the allocation depends on whether the term is “F.O.B. the place of shipment” or “F.O.B. the place of destination.” *Id.* The Marathon-Noil contract uses the latter—the “buyer facility” is the delivery destination.

Marathon was therefore required to transport the slurry to the terminal and deliver it “in the manner provided in section 1302.47” of the Ohio Code. *Id.* Section 1302.47 specifies that “unless otherwise agreed the *buyer* must furnish facilities reasonably suited to the receipt of the goods.” *Id.* § 1302.47(A)(2) (emphasis added). The contract does not suggest “otherwise,” so Noil was responsible for making sure that the terminal was “reasonably suited”—had space available—to receive the slurry.

Noil says that isn’t the end of the matter, because Marathon had conveyed during negotiations that it would take on this responsibility. But a long-standing rule of contract law prohibits courts from considering such “parol evidence”—statements that parties made before they reduced their agreement to a written contract. *Id.* § 1302.05; *Williams v. Spitzer Autoworld Canton, L.L.C.*, 2009-Ohio-3554, 913 N.E.2d 410, at ¶ 15 (explaining that the parol-evidence rule is a “matter of substantive law,” so “testimony introduced in violation of the rule . . . can be given no legal effect” (citation omitted)). People propose all kinds of commitments during negotiations, only some of which make their way into the ultimate agreement. The final written contract most reliably reflects the parties’ intentions about which commitments they intended to keep. *See Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, 413 (Ohio 1987) (“The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.”).

There are exceptions to that rule, but none apply here. Noil makes only a cursory assertion that the contract was not intended to be a “final expression of their agreement.” Ohio Rev. Code

§ 1302.05. And "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited]." *Wright v. City of Euclid*, 962 F.3d 852, 878 (6th Cir. 2020) (citation omitted).

Noil's primary position is that the court should consider extrinsic evidence for two reasons. First, the contract is silent (or ambiguous) about who was responsible for arranging storage. Second, Ohio law invites extrinsic evidence to show whether the parties "otherwise agreed" to not follow the F.O.B. term. *See* Ohio Rev. Code § 1302.47(A)(2). The first argument fails because the contract *does* allocate specific shipping and delivery responsibilities to each party: "[U]nless otherwise agreed," Marathon had to ship the slurry to the destination, and Noil had to "furnish facilities reasonably suited to [receive]" it. *Id.* The second argument fails because the statutory phrase "unless otherwise agreed" does not invite skirting the parol-evidence rule. All it does is make clear that parties *can* contract around the default understanding of the F.O.B. delivery term. Marathon and Noil did not do so.

In short, the contract unambiguously assigned Noil the task of arranging for space to receive the slurry. From this conclusion, we can make short work of each of the parties' claims.

*Breach of Contract.* Marathon fulfilled its obligations by bringing the slurry to the terminal on time. Noil accepted the slurry and resold it to a third party, but it did not fulfill its obligation to pay Marathon. Thus, the district court was correct: Noil breached the contract.

*Fraudulent and Negligent Misrepresentation.* Noil's claims for fraudulent and negligent misrepresentation fail for essentially the same reason. If Noil expected Marathon to arrange for storage space in the terminal, it should have resolved this inconsistency before signing the contract. *See Marion Prod. Credit Ass'n v. Cochran*, 533 N.E.2d 325, 334 (Ohio 1988) ("[A]n oral agreement cannot be enforced in preference to a signed writing which pertains to exactly the same

subject matter, yet has different terms."); *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 662 N.E.2d 1074, 1081 (Ohio 1996) ("A person of ordinary mind cannot say that he was misled into signing a paper which was different from what he intended to sign when he could have known the truth by merely looking when he signed." (cleaned up)). Noil may not now argue that it was misled into signing the contract with Marathon based on allegations of a prior, contradictory promise.

On appeal, Noil tries to recharacterize its fraudulent-misrepresentation claim to get around this conclusion. Noil says that we should focus on whether it was misled into entering its *resale* contract *with Althea*, rather than its contract with Marathon. But that's not the claim Noil brought in the district court. Noil alleged in its pleadings that Marathon's statements, representations, and omissions were "made with the purpose of inducing Noil to enter into the [Marathon] Contract." We will not consider Noil's recharacterization on appeal.[*]

*Tortious Interference*. Noil's tortious-interference claim also turns on these allegations of misrepresentation, and it also cannot succeed. An essential element of a tortious-interference claim is an "intentional and improper act" that prevents formation of a contract, causes breach of contract, or results in the termination of a business relationship. *Cedar Lane Farms Corp. v. Besancon*, 2019-Ohio-1389, 2019 WL 1598113, at ¶ 14. Noil says that Marathon (1) knew of Noil's intention to resell the slurry to a third party, (2) intentionally misled Noil into believing that it would secure delivery space for the slurry, and (3) caused Noil to lose its resale contract because it failed to fully deliver the slurry. The damage—the loss of Noil's resale contract—was thus caused by Marathon's inability to discharge the slurry into a tank at the terminal. But Noil has not alleged that Marathon intentionally withheld the slurry. Marathon would have delivered the slurry

---

[*] Noil also seeks to sever Marathon's liability from that of its general partner, MPC, based on this recharacterization. We reject that effort for the same reason.

into any available tank, and it was Noil's job to make sure that a tank was available. Again, it is Noil that fell short of its obligation.

*Damages.* One question remains: How much does Noil owe Marathon for the slurry? The contract has a pricing clause that pegs the cost to an oil index, but the parties disagree about which index the clause refers to.

The contract says the slurry would be priced according to the "[a]verage of Platt's U.S. Gulf Coast 3% Sulfur No. 6 Fuel Oil mean posting effective on August 23, 24 and 25, 2016, plus $0.42 per barrel." R. 4-1, Pg. ID 77. Marathon charged Noil according to the Platt's U.S. Gulf Coast 3% Sulfur (Waterborne) No. 6 Fuel Oil index. But Noil protests that the pricing clause did not include the word "Waterborne." Since there's no other index that exactly matches the language in the contract, Noil proposes a different option altogether: the "CME Gulf Coast No. 6 Fuel Oil 3.0% Platts Futures" index.

The district court correctly rejected Noil's argument. The official index name matches the contract language, except for the "(Waterborne)" parenthetical. It is a stretch for Noil to say that the missing parenthetical makes the clause ambiguous; there's no other index that better matches the contract language. But even if it were ambiguous enough to warrant consideration of extrinsic evidence, that evidence favors Marathon. Marathon told Noil's broker in an email that Marathon "price[s] everything off the Average of Platt's US Gulf Coast Waterborne 3% Sulfur No. 6 Fuel Oil mean price." R. 48-2, Pg. ID 534. In contrast, Noil's only evidence is that it used the other index in its resale contract. No reasonable jury could conclude that the Marathon-Noil contract was priced according to the futures index that Noil proposes.

We affirm.